GRAY, APPELLEE, *v.* ALLISON DIVISION, GENERAL MOTORS CORPORATION, APPELLANT.

(No. 35183—Decided April 14, 1977.)

Messrs. Davis & Young, Mr. Martin J. Murphy, and Messrs. Sharratt & Willman, for appellee.

Messrs. Weston, Hurd, Fallon, Paisley & Howley and Mr. Jerome S. Kalur, for appellant.

JACKSON, C. J. This action arises from the circumstances surrounding the termination of employment of the appellee, Jerome R. Gray, by the appellant, General Motors Corporation. In 1970, the appellee was employed as a Detroit Tracer Lathe operator by the Allison Division of General Motors. This division was engaged in the manu-facture of 81 millimeter mortar shells under contract for the United States Government.

Detroit Tracer Lathes were used in the first phase of production. The raw shell casings were ground down to roughly the proper outside diameter by the Detroit Tracer Lathe operator. The semi-machined shells were then placed on a conveyor which transported them to the next station where the inside diameter was bored out.

Prior to beginning work on the morning of January 16, 1970, the appellee was notified that he would be placed on layoff as part of a general lay off. During that day the appellee's foreman, Joseph Miller, observed raw shell casings moving down the conveyor and notified Donald Drake, the shop's general foreman. Drake subsequently observed the appellee placing raw shell casings on the conveyor and ordered him suspended. The appellee admitted that he placed the raw shell casings on the line. Evidence was submitted by both parties to the action that raw shell casings had appeared on the conveyor on many occasions, but it was disputed whether and to what extent the presence of the raw casings caused the disruption of production.

After appellee's suspension he was taken to the labor relations office and questioned about prior line break-

downs. On January 21, 1970, the appellee was discharged for a violation of Shop Rule 33, which states:

"Committing any of the following violations will be sufficient grounds for disciplinary action ranging from reprimand to immediate discharge, depending upon the seriousness of the offense in the judgment of management. * * *

"33. Sabotage * * *."

The appellee brought this action in the Court of Common Pleas of Cuyahoga County for libel and slander, alleging that he was "maliciously and falsely accused of committing sabotage while working on a job for the United States Government." The case was tried to a jury, which returned a verdict in favor of the appellee, awarding $100 in compensatory damages and $40,000 in punitive damages. It is from that verdict that this appeal is taken. Appellant assigns four errors:

"1. The trial court erred in failing to direct a verdict for defendant.

"A. The plaintiff failed to prove by any substantial evidence that there had been a publication of the alleged libel and/or slander.

"B. Plaintiff failed to present evidence of actual malice governing the alleged act of defamation.

"2. The trial court erred by charging the jury that it could award punitive or exemplary damages.

"3. The jury verdict involving the issue of truth as a defense is contrary to the weight of the evidence.

"4. Allowance of punitive damages in a defamation action, without proof of knowledge of falsity or reckless disregard for truth, violates the First Amendment to the United States Constitution."

By his first assignment of error the appellant maintains that the appellee failed to establish a *prima facie* case of libel and/or slander and therefore the court should have directed a verdict in favor of the appellant. We do not agree.

It is clear beyond question that not every act of defamation is actionable. The concept of privilege holds that

conduct which involves a specific interest of social importance merits protection and should be immune from liability. An absolute privilege is limited to very few situations, where there is a policy of complete freedom of expression regardless of motive. A qualified privilege has been applied to situations of intermediate importance, with immunity conditioned upon publication in a reasonable manner and for a proper purpose. Specifically, a qualified privilege has been applied to statements concerning a matter of common interest to the publisher and recipient which is furthered by the communication.

It is well established in Ohio that communications between an employer and an employee or between two employees concerning the conduct of a third or former employee made in good faith concerning a matter of common interest are within the doctrine of qualified privilege. *McKenna* v. *Mansfield Leland Hotel Co.* (1936), 55 Ohio App. 163; *DeAngelo* v. *W. T. Grant Co.* (1952), 64 Ohio Law Abs. 366.

While protected by a qualified privilege, defamatory statements will impose liability *only by establishing either that the defamation was published to someone not within the scope of the privilege, or if the defamation was only published to individuals within the scope of the privilege, that the act was done with actual malice.*

First, as to the question of publication, we find no evidence in the record of a publication of the alleged defamation to individuals not within the scope of the qualified privilege. The trial judge properly determined as a matter of law that statements made in the course of the grievance procedure were qualifiedly privileged. By virtue of appellee's union membership and his voluntary participation in the grievance procedure, qualified privilege is properly invoked. See *Joftes* v. *Kaufman* (D. C. 1971), 324 F. Supp. 660. If these communications were not privileged—that is, if representatives of employers and employees were subject to an action for damages as a result of statements made as to the pertinent facts of a controversy made in negotiations or collective bargaining ses-

sions—the likelihood of achieving peaceful resolutions or settlements would be extremely remote. While some evidence was presented that tended to demonstrate that individuals outside the privilege had discovered the alleged defamation, there was absolutely no evidence from which it could be concluded that General Motors was responsible for the publication. Moreover, the appellee testified that he told his fellow employees himself that he was being charged with "sabotage." With the record in this posture, the mere fact that individuals outside the scope of the privilege discovered the information is insufficient in and of itself to permit the inference that General Motors was responsible.

Second, as to the question of whether or not the evidence was such that reasonable minds could differ as to the presence of actual malice, we find that there was sufficient evidence adduced; consequently, the question was properly presented to the jury.

A review of the record reveals that it was undisputed that the custom of the appellant was to give verbal warnings for initial infractions of a shop rule and not to impose a suspension immediately. The record also reveals a considerable dispute as to the seriousness of the offense in question and whether or not the presense of raw shell casings would cause any disruption of production. The shop rules specify that disciplinary action will vary from reprimand to immediate discharge depending on the seriousness of the offense in the judgment of management.

Paul Papes, a fellow employee of the appellee, testified that raw shell casings did not cause the line to break down, but they were simply returned to the beginning of the line. Raymond George Wiggins, the union shop committeeman at Allison, testified that after the dismissal of the appellee he ran a test placing raw casings on the line and no problems developed. On the other hand, Donald Drake testified that not every raw casing will shut down the line. He stated that there was a great deal of variation in the size, shape and weight of raw casings, and that certain raw casings would cause the conveyor to snap because of

their greater size and weight, as the conveyor was only designed to carry machined casings. He further stated that a breakdown had previously occurred due to the presence of raw casings on the conveyor.

John Penniman, the plant personnel manager at Allison, testified that even though no breakdown occurred, if enough raw casings were placed on the line there would be insufficient room for finished stock. Consequently, someone would have to pull the raw casings off the line and either leave them next to the conveyor or return them to the Detroit Tracer Lathe operator.

At trial the appellee, Mr. Gray, admitted that he was aware that he was not supposed to place raw casings on the line, but said he knew raw shell casings would not cause a breakdown because he had done it before. During a deposition, however, he stated that the line could be damaged by the presence of raw casings.

While the record establishes that some instruction on the operation of the equipment was given to employees and that a copy of the shop rules was given to appellee, there is no testimony that the rules were explained to the employees. It is also undisputed that while the shop rules forbid ''sabotage'' there is no written company policy defining exactly what is included in that term. Rather, it is ''defined through the practices and rulings of the Umpire proceedings.''

There are other factors in the record which the jury is entitled to consider. Among them is the availability of other charges, including ''horseplay,'' a failure to do a job assignment, an unauthorized operation, or restricting output, for the appellee's actions. Another is the fact that the appellee was not permitted to see his alternate committeeman while in plant protection.

When this evidence is construed most strongly in favor of the appellee, as it must be upon a motion for a directed verdict, it is not clear that reasonable minds could come only to a conclusion adverse to the appellee. Consequently, since there were facts upon which a jury could infer actual malice, the appellant was not entitled to a di-

rected verdict and the matter was properly presented to the jury.

In its second assignment of error, appellant contends that it was improper for the jury to award punitive damages against General Motors.

It is well established in Ohio that punitive damages may not be recovered against a corporation in the absence of evidence that the corporation authorized, participated in, consented to, acquiesced in, or ratified the malicious or outrageous conduct of its employees or that the corporation was negligent in the selection of its employees. *Columbus Railway, Power & Light Co.* v. *Harrison* (1924), 109 Ohio St. 526; *Curry* v. *Big Bear Stores Co.* (1956), 75 Ohio Law Abs. 148; *Thomas* v. *F. & R. Lazarus & Co.* (1941), 40 Ohio Law Abs. 29.

This limited liability of corporate employers for punitive damages is in accord with the general theory of punitive damages. Such damages are awarded as punishment for the malicious intent of the defendant, and not as compensation for the benefit of the plaintiff. *Curry* v. *Big Bear Stores Co., supra.* The employer is not to be punished for the personal guilt of his servant or agent unless the employer authorized, ratified or participated in the wrongdoing. *Tracy* v. *Athens & Pomeroy Coal & Land Co.* (1926), 115 Ohio St. 298.

The trial judge instructed the jury that the acts of appellant's agents must have been ratified in order to award punitive damages against the defendant corporation.

The initial issue to be resolved is whether Mr. Drake, the general foreman, or Mr. Miller, the foreman, were acting within their authoritiy in suspending and discharging the appellee. Miller testified that he had the authority to suspend. This response was given by Miller in the context of explaining that he had nothing to do with the specific charge of sabotage. However, Plaintiff's Exhibit 2, the Notice of Disciplinary Action, which specifies that the appellee was discharged for a violation of Shop Rule 33 (sabotage), was signed by Miller on January 21, 1970. The

form is for use at the Allison Division of General Motors Corporation and requires the signature of the foreman as the highest management authority for discharges, disciplinary layoffs or reprimands.

Drake testified that his job as general foreman was to administer, organize and get production out in the most efficient and effective manner by utilizing the people and machinery, and also training foremen. It was Drake who told Miller to suspend the appellee. The discharge was given to the appellee by Drake and Miller at the employment office. Upon this record, the jury had adequate evidence upon which to determine that Drake and Miller were acting within the scope of their employment and authority in suspending and discharging the appellee.

The second issue for determination is whether the act of charging the appellee with a violation of shop rules prohibiting sabotage was in some manner authorized, participated in, consented to, acquiesced in, or ratified by the corporation.

The record discloses that the Notice of Disciplinary Action charging the appellee with violating Shop Rule 33 and discharging him on January 21, 1970, was signed by Miller and was entered on the record of the appellee as of the same date. The notice includes a description of the act construed by Miller to be sabotage. Some five months after the discharge, on June 12, 1970, the record further discloses that the discharge was changed to a layoff without back pay.

Subsequent to the discharge of the appellee, at the completion of its defense commitments, the Allison plant was ordered dismantled. The union appeal process, however, apparently continued past that date. Whether to construe the five months delay in the change of appellee's status as a repudiation of the action of Miller and Drake or as an acquiescence by the corporation, and the change in status as merely a matter of corporate convenience was a determination the jury was entitled to make. The second assignment of error by appellant is overruled.

Appellant, by its third assignment of error, asserts

that the jury verdict involving the issue of truth as a defense is contrary to the weight of the evidence. We find no merit in this assignment of error.

Black's Law Dictionary (4th ed. 1968), defines sabotage as:

"* * * [A] willful obstruction and interference with the normal processes of industry. It aims at inconveniencing and tying up all production, but stops short of actual destruction or of endangering human life directly."

John Penniman, General Motors' personnel manager, testified similarly that management's interpretation of the term "sabotage" was:

"Any interference with production * * *. It may have nothing to do with destruction. It would include obstruction, delay of production, putting wrong parts * * *."

While the appellant admitted that he placed the raw shell casings on the conveyor belt as aforestated, it was disputed whether and to what extent the presence of raw shell casings caused disruption of production.

In the case at bar there was no evidence that sabotage had any special meaning, nor did the parties request special instructions. Hence, the jury may determine whether or not the appellee committed sabotage based upon the plain and ordinary meaning of the word and the evidence adduced at trial. The jury may not infer malice merely from the use of the word, but may properly consider the ideas the word is calculated to convey to those to whom it is addressed under the circumstances and occasion of its use.

The asserted belief of the appellant in the truth of the charge is no defense. Such belief may merely be considered by the jury as evidence of the existence of malice and towards the mitigation of damages.

By its fourth assignment of error the appellant asserts the claim that the allowance of punitive damages without proof of knowledge of falsity or reckless disregard for the truth violates the First Amendment of the Constitution of the United States. It cites *Gertz v. Welch* (1974), 418 U. S. 323, in support of its position.

In *New York Times* v. *Sullivan* (1964), 376 U. S. 254, the United States Supreme Court held that the constitutional guarantees of free speech and press require a federal rule that prohibits a *public official* from recovering damages for a defamatory falsehood *relating to his official conduct* unless he proves that the statement was made with "actual malice," that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

The Supreme Court first defined what it meant in earlier cases by the term "public official" or "public figure" in *Gertz* v. *Welch, supra,* at 345:

"* * * For the most part those who attain this status have assumed roles of *especial prominence in the affairs of society*. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. *More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved*. In either event, they invite attention and comment." (Emphasis added.)

The court stated that while hypothetically it may be possible for someone to become a public figure through no purposeful action of his own, instances of truly involuntary public figures are rare.

One of the bases for the holding in *Gertz* was that public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals.

In the instant case the appellee did not assume any role of especial prominence in the affairs of society. He has not thrust himself to the forefront of public controversy, nor does he occupy a position of persuasive power such that he enjoys significantly greater access to the channels of effective communication. Under the test announced in *Gertz* the appellee is not a public figure and appellants are not protected by the constitutional privilege of the *New York Times* case.

In *Gertz* v. *Welch, supra*, the United States Supreme Court further discussed the liability of a publisher or broadcaster for punitive damages. The Court balanced the interest of a private citizen against the right of a free press and concluded that the First Amendment does not allow awards of punitive damages against *publishers* and *broadcasters* unless actual malice is shown. The appellant asks this court to extend this privilege against punitive damages to all based upon the right of freedom of speech.

It is unnecessary for this court to determine whether the constitutional privilege announced in *Gertz* extends to others based upon the right of freedom of speech. In Ohio *all* awards of punitive damages must be based upon a finding of actual malice. In the instant case the jury below found actual malice, and the liability of the appellant company for punitive damages need only be determined with reference to state law.

The trial court herein properly instructed the jury upon the issue of malice. The jury, in resolving the factual question, determined that General Motors acted with actual malice. While the record does not disclose any direct evidence of actual malice, the jury inferred such malice from the following acts as specified in its answer to interrogatories:

1. No verbal reprimand before suspension.
2. Improper investigation of the alleged act.
3. The charge of "sabotage" too severe for the acts of plaintiff.

In Ohio the general rule is that punitive or exemplary damages are only recoverable if actual malice is shown. *Davis* v. *Tunison* (1959), 168 Ohio St. 471; *Wilchins* v. *Pool* (1971), 29 Ohio App. 2d 223. Exemplary damages by their very nature are unliquidated, and the amount to be awarded rests largely, in the first instance, with the jury. *Wisner* v. *S. S. Kresge Co.* (Mo. App. 1971), 465 S. W. 2d 666, 670; *Morgan* v. *Arnold* (Tex. Civ. App. 1969), 441 S. W. 2d 897. Appellate courts are normally reluctant to interfere with such awards. *Jones* v. *Spindel* (1973), 128 Ga. App. 88, 196 S. E. 2d 22.

The discretion of the jury in the award of exemplary

damages is not arbitrary and unlimited. The jury is not at liberty to award by way of such damages any amount regardless of how large. *Petsch* v. *Florom* (Wyo. 1975), 538 P. 2d 1011.

While no rigid mathematical formula can be applied, awards of exemplary damages must not be so disproportionate to actual damages sustained as to indicate that they are the result of passion and prejudice rather than reason the part of the jury. *Trahan* v. *Cook* (1972), 265 So. 2d 125; *Boise Dodge, Inc.* v. *Clark* (1969), 92 Idaho 902, 453 P. 2d 551; *Petsch* v. *Florom, supra; Oppenhuizen* v. *Wennersten* (1966), 2 Mich. App. 288, 139 N. W. 2d 765. They must bear some reasonable relation or proportion to actual damages, that is, the nature and extent of the wrong done the plaintiff. *Jacobson* v. *Benson Motors, Inc.* (Iowa 1974), 216 N. W. 2d 396; *Givens* v. *W. J. Gilmore Drug Co.* (1940), 337 PA. 278, 10 A. 2d 12; *Egan* v. *Mutual of Omaha Ins. Co.* (1976), 63 Cal. App. 3rd 659, 133 Cal. Rptr. 899; *McNeill* v. *Allen* (1975), 35 Colo. App. 317, 534 P. 2d 813; *Jones* v. *Spindel, supra.* That the principle upon which compensatory damages is based is that "justice requires that the injured party should be made whole," *Railroad Company* v. *Hutchins* (1881), 37 Ohio St. 282.

Applying these principles to the evidence presented in the case under consideration, wherein the appellee admits committing the act from which this litigation developed and acknowledged that he was aware he was in violation of company rules and that he communicated to fellow workers that he was charged with "sabotage"; wherein there is no direct testimony indicating the existence of actual malice; wherein malice was admittedly inferred by the jury from certain designated acts of the appellant; and wherein the jury determined that appellee had suffered actual damage in the amount of $100, we find that the award of $40,000 in punitive or exemplary damages (400 times the compensatory award) was so grossly disproportionate to the actual damages awarded as to be excessive and raise a presumption that the award is the result of passion and prejudice.

Consequently, the judgment of the trial court must be reversed and the cause remanded for a new trial.

*Judgment reversed and cause remanded.*

CORRIGAN, J., concurs.

KRENZLER, J., dissents.

KRENZLER, J., dissenting. I concur in the judgment of reversal, but dissent from the portion of the judgment ordering a new trial. I would reverse and enter a final judgment for the defendant.

The law is well settled that communicatioans between employers or employees concerning another employee about a matter of common interest are within the doctrine of qualified privilege. This means that a party is not liable for any defamation that falls within the privilege unless it is established that the defamation was published to someone not within the scope of the privilege or that the publication was made with actual malice.

I agree with the majority that there was no evidence in the record of the publication of defamation to individuals not within the scope of the qualified privilege. However, a review of the record also demonstrates that there is insufficient evidence of the presence of actual malice to submit this issue to the jury. Since there was insufficient evidence of publication to outside parties or of actual malice, the qualified privilege in the instant case prevents the appellee from recovering either compensatory or punitive damages from the appellant.

Further, even if a party is entitled to compensatory damages, he cannot recover punitive damages in a defamation action unless he demonstrates that the other party acted with actual malice in making the communication. Thus, even if there was evidence of publication to outsiders so as to remove the qualified privilege of the appellant, the appellee would not be entitled to punitive damages since there was insufficient evidence of actual malice.

In my opinion, the first and second assignments of error are well taken and the judgment in this case should be reversed and a final judgment entered for the appellant.