SMITH, APPELLANT, *v.* KLEIN ET AL., APPELLEES.

(No. 48749 — Decided March 21, 1985.)

*James M. Mackey* and *Frank P. Giaimo,* for appellant.

*William A. Viscomi* and *Joseph W. Pappalardo,* for appellees.

JACKSON, P.J. Appellant, George Smith, III, is a certified public accountant. He was hired in April 1981 by Manco Tape, Inc. From the newly created post of financial vice president, appellant was expected to supervise the accounting department and also perform financial planning functions to conform with the growth of the company.

At the time of appellant's arrival at Manco, the day-to-day operations of the accounting department were performed by a staff of clerks, supervised by a controller. Appellant had been with Manco for only a few days when the controller resigned. The position of controller remained vacant through the summer months. During that time the accounting department did not operate smoothly.

In August 1981, appellant approached Jack Kahl, the president of Manco, and suggested that a new controller was needed to restore the efficient functioning of the accounting department. Appellant recommended

that the appellee, Gregory Klein, be hired for the job. Appellant also attributed much of the confusion in bookkeeping to Ms. Hildegarde Rehner, the accounts payable clerk. Rehner was a long-time employee of Manco, but appellant did not believe that she was performing her duties competently. In addition, there was a personality conflict between appellant and Rehner.

Apparently as a result of appellant's suggestions to Jack Kahl, in September 1981, Klein was hired as controller, and Rehner was transferred out of the accounting department. Klein's responsibilities as controller were to install and maintain accounting records, audit the accounts, and locate and rectify problems with the corporation's books.

On the morning of October 8, 1981, just a couple of weeks after Klein assumed the responsibilities of controller, he arranged a private meeting with Jack Mulloy, who was at that time the executive vice president of Manco Tape. Precisely what Klein said to Mulloy at that meeting is not known, but subsequently, during lunch, Mulloy told appellant that he could not believe what Klein was saying about appellant.

Mulloy and Klein met with Kahl that afternoon. At about four o'clock, appellant was summoned to Kahl's office and fired.

Appellant subsequently filed a complaint in common pleas court, alleging that Klein had intentionally and maliciously interfered in the employment relation between appellant and Manco Tape, and also that Klein had defamed appellant.

Based on his noontime conversation with Mulloy on October 8, appellant believes that Klein accused him of embezzling company funds, mistreating employees, and other wrong-doing. If appellant is to prevail on either of his causes of action, he must discover what Klein said to Mulloy at the private meeting between them and later what Klein said to Kahl at the meeting that afternoon between Klein, Mulloy and Kahl. Appellant's two separate attempts to take Mulloy's deposition, however, were both disrupted by Klein's attorney. The second attempted deposition was unilaterally terminated by Klein's attorney.

On January 13, 1984, Klein filed a motion for summary judgment, supported by the affidavit of Kahl. Appellant opposed the motion with his own affidavit. Moreover, appellant filed a motion to compel discovery and for sanctions, and moved the trial court to stay the ruling on summary judgment, pending resolution of the discovery dispute. The trial court denied appellant's motions, and granted summary judgment in favor of defendant Klein.

In his two assignments of error, appellant argues that the court below erred in granting Klein's motion for summary judgment, and that the court erred in denying appellant's motion to compel and for sanctions.

I

Summary Judgment

Civ. R. 56(C) governing summary judgment provides that:

"Summary judgment shall be rendered * * * if the pleading, depositions, * * * affidavits, transcripts of evidence * * * show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" (Emphasis added.)

This rule further provides:

"A summary judgment *shall not be rendered unless* it appears from such evidence or stipulation and only therefrom, *that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor.*" (Emphasis added.)

Klein advanced three reasons in sup-

port of his position that summary judgment in his favor was appropriate.

### A

First, Klein argues that there can be no tort of interference with business relations unless there is a contract,[1] and that since appellant's employment with Manco was terminable at will by either the employer or employee, appellant had no contract and no cause of action.

We note initially that the Ohio courts, while recognizing the continued viability of the concept, have consistently referred to it as an employment *contract,* terminable at will.[2] Professor Corbin explained:

"Another example of a unilateral contract in the form of an offered promise to pay for service to be rendered, is the case of an agreement to employ a person for an indefinite period at a stated salary per day or month or year. In a good many such cases, it has been held that the employee has made no promise of any kind; he accepts the offer by merely continuing to render the specified service, and becomes entitled to the promised salary in proportion to the work actually done. By such an interpretation of the expressions of the parties as this, the transaction is a 'hiring at will.' " 1 Corbin, Contracts (1963) 292-293, Section 70.

---

[1] Despite Klein's insistence that a contract is always required, the case law in Ohio is otherwise. A cause of action for interference is made out when "* * * one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another * * *." *Juhasz* v. *Quik Shops, Inc.* (1977), 55 Ohio App. 2d 51, 57 [9 O.O.3d 216]. (Emphasis added.)

[2] See *Henkel* v. *Educational Research Council* (1976), 45 Ohio St. 2d 249 [74 O.O.2d 415]; *Stearns* v. *Ohio Savings Assn.* (1984), 15 Ohio App. 3d 18; *Hedrick* v. *Center for Comprehensive Alcoholism Treatment* (1982), 7 Ohio App. 3d 211; *Peterson* v. *Scott Constr. Co.* (1982), 5 Ohio App. 3d 203.

Even in *West* v. *Roadway Express, Inc.* (1982), 8 OBR 155, cited to the trial court by Klein, the court stated:

"However, a cause of action is cognizable for interference with an employment relationship, even absent a contract." *West, supra,* at 165.

On a policy level, this court is not inclined to declare an "open season" on those employees who do not have fixed-term contracts. An employee who is terminable at will may nonetheless justifiably expect that his continued employment depends on the will of the employer, not upon the whim of an office Iago.

As a matter of law, Klein is not entitled to summary judgment upon this first ground.

### B

Second, Klein contends that any statements he made were privileged and therefore are not actionable even if false.

Ordinarily, defamatory statements that injure a person in his trade or profession are actionable *per se. Hedrick* v. *Center for Comprehensive Alcoholism Treatment* (1982), 7 Ohio App. 3d 211. However, Ohio courts have recognized the applicability of a qualified privilege in both defamation[3] and interference[4] cases.

---

[3] See *Evely* v. *Carlon Co.* (1983), 4 Ohio St. 3d 163; *Costanzo* v. *Gaul* (1980), 62 Ohio St. 2d 106 [16 O.O.3d 134]; *Fawcett* v. *G.C. Murphy & Co.* (1976), 46 Ohio St. 2d 245 [75 O.O.2d 291]; *Hahn* v. *Kotten* (1975), 43 Ohio St. 2d 237 [72 O.O.2d 134]; *Stearns* v. *Ohio Savings Assn., supra; Holloman* v. *Rutman Wine Co.* (1983), 11 Ohio App. 3d 257; *Hedrick* v. *Center for Comprehensive Alcoholism Treatment, supra; Creps* v. *Waltz* (1982), 5 Ohio App. 3d 213; *Gray* v. *General Motors Corp.* (1977), 52 Ohio App. 2d 348 [6 O.O.3d 396]; *DeAngelo* v. *W. T. Grant Co.* (App. 1952), 64 Ohio Law Abs. 366.

[4] See *Donald G. Culp Co.* v. *Reliable Stores Corp.* (1983), 14 Ohio App. 3d 161; *Juhasz* v. *Quik Shops, Inc., supra; Pearse* v.

" 'A qualified or conditionally privileged communication is one made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right or interest. *The essential elements thereof are good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only.*' (Emphasis added.)" *Hahn* v. *Kotten* (1975), 43 Ohio St. 2d 237, 244 [72 O.O.2d 134] (quoting 50 American Jurisprudence 2d 698, Libel and Slander, Section 195).

The existence *vel non* of a qualified privilege is an issue frequently raised in defamation suits between fellow employees. Generally, if made in good faith, such communications are privileged. *Gray* v. *General Motors Corp.* (1977), 52 Ohio App. 2d 348 [6 O.O.3d 396].

A threshold showing of qualified privilege would not dispose of this case; instead, it merely triggers a second level of inquiry:

"Usually, such communication, when made in good faith on a matter of common interest, between an employer and an employee or between two employees concerning a third employee are protected by a qualified privilege. *Gray* v. *General Motors Corp.* (1977), 52 Ohio App. 2d 348 [6 O.O.3d 396]. *However, where the defamation is published (including spoken or written) to someone not within the qualified privilege or is done with actual malice, the privilege will not protect an individual. Gray, supra.*" (Emphasis added.) *Stearns* v.

*Ohio Savings Assn.* (1984), 15 Ohio App. 3d 18, 20.

The question therefore becomes: Assuming that Klein might have been privileged to speak under the circumstances, did he exceed that privilege?

"The second paragraph of the syllabus in *Hahn* sets forth the standard adopted in this state as to when a qualified privilege is exceeded:

" 'A qualified privilege protecting the making of defamatory statements is exceeded when the statements are made with "actual malice," that is, with knowledge that the statements are false or with reckless disregard of whether they were false or not.' " *Costanzo* v. *Gaul* (1980), 62 Ohio St. 2d 106, 111 [16 O.O.3d 134].

## C

Klein argues that appellant failed to show that Klein's statements were made with actual malice.

If a defendant submits evidence indicating that his statements were qualifiedly privileged, then the plaintiff has the additional burden of showing that the defendant exceeded the privilege. See *Evely* v. *Carlon Co.* (1983), 4 Ohio St. 3d 163. In order to prove actual malice, the plaintiff must show that the statements were made with knowledge of their falsity, or with reckless disregard of whether they were false or not.[5] *Hahn, supra,* paragraph two of the syllabus. The jury must then decide whether the evidence is sufficient to establish actual malice.[6] *DeAngelo* v. *W. T. Grant Co.* (App. 1952), 64 Ohio Law Abs. 366.

Obviously, then, it is essential for a plaintiff to be able to discover what the defendant said, if he is to bear his burden of proving actual malice.

*McDonald's* (1975), 47 Ohio App. 2d 20 [1 O.O.3d 164].

[5] In his affidavit submitted in opposition to summary judgment, appellant sets forth some facts which would support a finding of actual malice.

[6] The presence or absence of actual malice is a question of fact.

However, a plaintiff cannot possibly bear such a burden if his efforts at discovery are unjustifiably hindered and obstructed by defense counsel. Therefore, this court must turn its attention to the second assignment of error, which pertains to appellant's motion to compel discovery.

## II
### Discovery

Appellant's second attempted deposition of Jack Mulloy was terminated abruptly by Klein's attorney. After repeatedly instructing Mulloy not to answer questions, Klein's attorney said, "I've had enough. You pushed me * * * too far." He then walked out of the deposition, *taking Mulloy with him.*

Civ. R. 30(D), governing motions to terminate or limit examinations, provides that upon demand of an objecting party or the deponent, a deposition may be suspended for the time necessary to seek a motion for a protective order from the court. Such an order may be granted upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party.

The record in the case at bar fails to disclose that defense counsel moved for a protective order. Instead, he arbitrarily chose to end the deposition because he had "had enough." Such conduct on the part of counsel is not authorized by the Civil Rules and is not condoned by this court.

The behavior of defense counsel during the course of the deposition followed the same uncooperative pattern. The goal of defense counsel apparently was to prevent appellant from learning what Klein said to Mulloy, regardless of whether counsel's tactics violated the Ohio Rules of Civil Procedure. In furtherance of that objective he repeatedly interjected his own version of the facts, put words in the witness' mouth, or instructed the witness not to answer. See Appendix.

The United States Supreme Court has said, "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Hickman* v. *Taylor* (1947), 329 U.S. 495, 507. The Ohio Supreme Court has stated:

"The purpose of the liberal discovery policy contemplated by the Ohio Rules of Civil Procedure is the narrowing and sharpening of the issues to be litigated." *State, ex rel. Daggett,* v. *Gessaman* (1973), 34 Ohio St. 2d 55, 56 [63 O.O.2d 88].

It was in that spirit that Civ. R. 26(B) was promulgated. Civ. R. 26(B)(1) provides[7]:

"In general. Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

If an objection is interposed at a deposition, the evidence will nevertheless be taken, subject to the objection. Civ. R. 30(C). That is, the question still must be answered after the objec-

---

[7] The word "privileged," as used in the rule, refers to evidentiary privileges such as attorney-client or work product, not the qualified privilege discussed above.

tion is noted on the record. Although it is proper in some circumstances to direct a deponent not to answer, those circumstances are extremely rare.

"* * * It is not the prerogative of counsel, but of the court, to rule on objections. Indeed, if counsel were to rule on the propriety of questions, oral examinations would be quickly reduced to an exasperating cycle of answerless inquiries and court orders. Alternatively, if the plaintiffs' attorney believed that the examination was being conducted in bad faith, that the information sought was privileged, or that the deponents were being needlessly annoyed, embarrassed, or oppressed, he should have halted the examination and applied immediately to the *ex parte* judge for a ruling on the questions, or for a protective order, pursuant to Rule 30(d). He had no right whatever to impose silence or to instruct the witnesses not to answer, especially so when the witnesses were not even his clients." *Shapiro* v. *Freeman* (S.D. N.Y. 1965), 38 F.R.D. 308, 311-312.

Moreover, it is not the function of counsel to act as a puppet master, offering his client's proffered answer in lieu of the deponent's answers. The purpose of a deposition is to probe the mind of the deponent, not to elicit self-serving answers from counsel. In summary:

"* * * It is time that depositions be conducted by members of the bar in a cooperative manner, in accordance with both the letter and spirit of the rules, without petty bickering and without intervention by busy courts with more important matters pressing for attention." *Shapiro, supra,* at 312.

When opposing counsel do not cooperate, the proper regulation of discovery practice is committed to the discretion of the trial court. *State, ex rel. Daggett,* v. *Gessaman, supra.* "The court has the same if not greater right and duty to regulate discovery as it does to control the trial and to impose reasonable limits and conditions, consistent with the rules, to expedite the administration of justice." *Penn Central Transportation Co.* v. *Armco Steel Corp.* (1971), 27 Ohio Misc. 76 [56 O.O.2d 295], paragraph four of the syllabus.

However, where a trial court's refusal to allow discovery is improvident and prejudicially affects the substantial rights of the parties, an appellate court will rectify the trial court's abuse of discretion. See *State, ex rel. Daggett, supra,* at 58. In the case at bar, this court is convinced that the refusal of the trial court to allow further discovery constituted an abuse of discretion. Therefore, appellant's second assignment of error is well-taken.

Likewise, it was error for the trial court to grant summary judgment in favor of the party patently obstructing discovery. This court cannot condone a defense strategy that withholds vital factual information from the plaintiff, then demands summary judgment on the ground that plaintiff is unable to contradict the defendant's factual assertions. Appellant's first assignment of error is sustained.

Accordingly, the judgment of the trial court is reversed, and the cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

PRYATEL and KRUPANSKY, JJ., concur.

### Appendix

Deposition of Jack Mulloy:

"Q. Was Mr. Klein able to tell you why that was?

"A. He said that there were bills that we received from our suppliers that were not posted.

"Q. Were there any other matters that he brought to your attention at that meeting?

"A. Yes. He said he had an opinion regarding this Hildegarde Rehner.

"Q. Did he express it?

"A. Yes; that she in effect was railroaded out of the department by George Smith."

* * *

"Q. I'm not sure that explains to me, though, whether Mr. Klein explained to you what railroaded meant.

"A. He felt that Mr. Smith was putting undue pressure onto Mrs. Rehner to do maybe work that was either too much work or too demanding of her time."

* * *

"Q. Did Mr. Klein make any other comments about George Smith at this meeting?

"MR. VISCOMI: Well, the record should show that everything he says can't be inclusive. He's recalling what he can recall. Do you recall any other comments?

"A. About George Smith?

"Q. Yes.

"A. No.

"MR. VISCOMI: That is to say, there may have been, but he doesn't recall them."

* * *

"Q. Did you tell him anything else about what Mr. Klein had said to you?

"A. I don't recall.

"Q. Did you tell Mr. Smith that you couldn't believe what Mr. Klein was saying about him?

"A. Yes, I did.

"Q. Why is that?

"MR. VISCOMI: Objection. He didn't say anything about him that was not testified to. There was nothing said about Mr. Smith. There were statements made about the accounting procedures. He did not testify that something was said about Smith directly. Comments were made with respect to the accounting procedures. If you want to clear that up, you can, but that's what the testimony was.

"MR. GIAMO [sic]: I'm not sure that's that case, Bill, so let me explore that a little bit.

"Q. Mr. Mulloy, in the meeting that you had on the morning of the 8th with Klein, did Klein attribute these accounting problems to Mr. Smith?

"A. Indirectly, because Mr. Smith was the head of that department.

"Q. I am not sure what that means. Did he say anything to him to link his criticism to the accounting procedures, to Mr. Smith?

"A. Not specifically.

"Q. How did he indirectly comment on Mr. Smith?

"A. Pardon?

"MR. VISCOMI: He didn't comment on Mr. Smith.

"MR. GIAMO [sic]: Well, okay, but what Mr. Mulloy said was —

"MR. VISCOMI: Because Smith is in charge of accounting, and if there is a criticism of accounting, I assume anybody would assume that the man responsible should take some responsibiliy [sic]. That's what he is saying. I don't want you to put words in his mouth. There is nothing said personally about Mr. Smith.

"Q. Mr. Mulloy, did Mr. Klein intimate to you or say to you, rather, that Mr. Smith could be stealing lots of money from Manco?

"MR. VISCOMI: Objection. Number one, intimate is objected to. If your question is did he say to you that Smith could be stealing money — is that your question?

"MR. GIAMO [sic]: Sure, Bill. Listen. That's what I changed it to."

* * *

"Q. What was said in the meeting between Kahl, Klein and yourself?

"A. It was just —

"MR. VISCOMI: I'm going to object, but you can relate it.

"A. From the standpoint I told Jack Kahl that Greg Klein had indicated and made these statements and George

Smith had denied the statements, and that I went into the meeting, I says, 'Greg, would you tell Jack what you told me, just so that we are on the same basis?'

"MR. VISCOMI: When you state this meeting, you mean relating to the accounting procedures?

"A. Relating to the accounting procedures that he talked about to me earlier.

"Q. Well, I'm confused now. Did you tell Klein to say to Jack Kahl what he said to you about accounting or what he said about George Smith?

"A. No. I said the meeting.

"MR. VISCOMI: Note my objection again. His testimony is there was nothing said about Smith, and I won't let you —

"MR. GIAMO [sic]: That's not what he began to say, Bill.

"MR. VISCOMI: That's exactly what he has testified to, and I won't let you change that or make that erroneous. His testimony is nothing was said about Smith. Is that your testimony?

"THE WITNESS: Yes, it is.

"MR. VISCOMI: Please do not interject that factor. It's not in this. He did not say anything personally about Smith. He talked about accounting procedures. That's his testimony. If you continue to alter that, I'll continue to object.

"MR. GIAMO [sic]: That's fair enough.

"Q. Do you remember where you were, Mr. Mulloy?

"MR. VISCOMI: Wait. I don't remember. What question was posed? What was said at the meeting between Klein, Kahl and Mulloy, and I object to that question, but I will allow him to answer it."

* * *

"Q. Did Mr. Kahl have anything to say at this meeting?

"MR. VISCOMI: I'll note a continuing ojection [sic]. I'll make a continuing

objection, not to interrupt you, with respect to the meeting.

"Q. Go ahead, Mr. Mulloy. Did Mr. Kahl say anything at this meeting?

"A. I don't know if I am prepared to answer that.

"MR. VISCOMI: My objection is for the record with respect to what was said at the meeting. If you recall that was said, tell him that. I think probably Kahl is in a better position to answer that, and I don't want you to guess, so let's leave it at that. He doesn't want you to guess either, and we have Mr. Kahl here, so —

"Q. You are saying, Mr. Mulloy, that you don't recall?

"A. No. I don't recall what Jack Kahl's comment to all this was."

* * *

"Q. Mr. Mulloy, is Jack Kahl a volatile person?

"MR. VISCOMI: Objection. Is Jack Kahl a volatile person? Objection. Don't answer that.

"Q. Did anyone in the office at Manco confess to you that they were afraid of Jack Kahl?

"MR. VISCOMI: Objection. He's not to answer that question.

"MR. GIAMO [sic]: What's the objection to the second one, Bill?

"MR. VISCOMI: Objection. He's not going to answer the question.

"MR. GIAMO [sic]: Do you want to tell me the ground?

"MR. VISCOMI: No, other than it's irrelevant and it would be hearsay, and it has no basis in this lawsuit. I can think of some others, but I would have to look at my rules of evidence.

"MR. GIAMO [sic]: I'm not sure I agree with you on these."

* * *

"MR. VISCOMI: He didn't say that.

"Q. What did he say about George Smith?

"A. He didn't.

"Q. Didn't he say George Smith railroaded Hildegarde out?

"MR. VISCOMI: Objection.

"Q. Did he say that?

"MR. VISCOMI: Did he say George Smith railroaded Hildegarde?

"Q. Yes. Did he say George Smith railroaded Hildegarde out?

"A. I don't know if I can answer that. I answered.

"Q. Well, then who railroaded her out?

"MR. VISCOMI: Objection. You don't have to answer that.

"Q. Yes, you do have to answer that.

"MR. MACKEY: Note it on the record, and we will take it to court. I want that question answered right now.

"MR. VISCOMI: You are not going to answer it.

"Q. Is Mr. Viscomi your attorney?

"MR. VISCOMI: Yes, I am.

"Q. Have you been retained by him?

"MR. VISCOMI: You don't have to answer that.

"MR. MACKEY: I want the question answered.

"MR. VISCOMI: Let's go.

"MR. MACKEY: No. Okay, we will move on.

"MR. VISCOMI: Let's go.

"MR. MACKEY: Note that on the record, and we will move on.

"MR. VISCOMI: Let's go back.

"MR. MACKEY: Wait a minute, Bill, I won't ask him any more.

"MR. VISCOMI: I've given you a leeway for 30 minutes. That's enough. You are taking advantage.

"MR. MACKEY: I only have 20 minutes left.

"MR. VISCOMI: I've had enough. You pushed me to [sic] too far.

"MR. MACKEY: Off the record.

"(Discussion off the record.)

"(Deposition adjourned at 11:30 a.m.)

"(SIGNATURE NOT WAIVED.)"