Judy HARTLEY, Plaintiff,

v.

DAYTON COMPUTER SUPPLY,
Defendant.

No. C–3–95–448.

United States District Court,
S.D. Ohio,
Western Division.

Jan. 25, 1999.

Dwight Brannon, Dayton, OH, for Plaintiff.

Julie C. Ford, Bruce Pence, Dayton, OH, for Defendant.

**DECISION AND ENTRY SUSTAINING DEFENDANT'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT AS TO COUNTS IV, V, VII, AND VIII, AND OVERRULING IN PART AND SUSTAINING IN PART DEFENDANT'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT AS TO COUNT VI (DOC. # 72); CONFERENCE CALL SET**

RICE, Chief Judge.

On April 25, 1995, Judy Hartley was discharged from her employment as a sales representative for Dayton Computer Supply. As a result of that termination, Hartley initiated this lawsuit, in which she alleged that Defendant discriminated against her on the basis of her sex, age, and religion by failing to promote her and by terminating her employment. In Counts IV through VIII, Plaintiff also asserted state law causes of action for intentional infliction of emotional distress, tortious interference with her business, unjust enrichment/quantum meruit,

breach of implied contract, and promissory estoppel.

On March 6, 1997, by notation order, this Court sustained Defendant's Unopposed Motion to Dismiss Counts IV through VIII in Plaintiff's Amended Complaint. Both parties subsequently filed motions for summary judgment on the remaining claims, setting forth claims for relief sounding in federal law and Chapter 4112 of the Ohio Revised Code. (Doc. # 56, Doc. # 57) On March 9, 1998, prior to ruling on the summary judgment motions, the Court reinstated Counts IV through VIII. (Doc. # 71) On March 30, 1998, Dayton Computer Supply filed a Supplemental Motion for Summary Judgment (Doc. # 72), seeking summary judgment on the reinstated claims. On September 25, 1998, the Court overruled Plaintiff's earlier Motion for Summary Judgment, and overruled in part and sustained in part Defendant's earlier such motion.[1] (Doc. # 86) The Court now addresses Dayton Computer Supply's Supplemental Motion for Summary Judgment, directed exclusively to the reinstated state claims. As discussed below, after reviewing the record and the applicable law, Defendant's Motion (Doc. # 72) is Sustained as to Counts IV, V, VII, and VIII, and Overruled in Part and Sustained in Part as to Count VI (unjust enrichment/quantum meruit).

I. *Factual Background*

Plaintiff Judy Hartley ("Hartley") was hired by Defendant Dayton Computer Supply ("DCS") as a sales representative in 1990. DCS is a small company, which is owned and primarily managed by two brothers, Ned and Phillip Denlinger. Ronald Hertlein, its sales manager, is the

---

1. The Court granted summary judgment to Defendant on Plaintiff's claims that she was discharged due to her sex, age, and religion, in violation of Title VII, the ADEA, and Chapter 4112. Following that Decision and Entry, the causes of action that remained were Plaintiff's claims of discrimination on the basis of her sex, age, and religion, in violation of Chapter 4112, when Defendant twice failed to promote her to the position of sales manager, and her reinstated claims, Counts IV through VIII.

third member of Defendant's management team.

When her employment began, Plaintiff was permitted to work out of her home, although she was provided a desk at the Defendant's place of business. To facilitate working at home, Hartley purchased a computer from DCS at cost, which was about two to three hundred dollars below retail price. In late 1994, DCS decided to require that all its sales representatives work inside its office rather than being permitted to continue to work at home.[2] At about the same time, another change occurred, which also affected the manner in which Plaintiff conducted her employment. For approximately one year, Defendant had assigned a particular assistant to each sales representative. However, DCS decided to change that system, because the other sales representatives felt that it was not working. Thereafter, all sales representatives would share the services of all assistants.

Hartley objected strenuously to each of these changes, fearing that it would diminish the amount of commissions she could earn. For instance, on November 8, 1994, Phillip Denlinger and Ronald Hertlein met with Hartley to explain the changes to her and to enlist her support. Rather than being supportive, Plaintiff threatened to quit and mentioned that she was interviewing with other potential employers, including a competitor of the DCS. In addition, Plaintiff told Hertlein that she did not respect him as a manager and that she did not like taking direction from him for that reason. Throughout the remainder of 1994, and into the Spring of 1995, Plaintiff's unhappiness with her supervisors and her employer continued to manifest itself. She continued to talk of quitting and was openly insubordinate to Hertlein. DCS's management noticed that this was causing a general decline in employee morale.

On April 20, 1995, Hartley met with Phillip Denlinger and Hertlein. Although the purpose of that meeting was not to discuss the Plaintiff's attitude and complaints, that quickly became its central topic. During that conversation, Plaintiff accused the Defendant's management, primarily Hertlein, of not being able to motivate its sales representatives and threatened to quit. Hertlein and Phillip Denlinger asked the Plaintiff to clarify her intentions with respect to resigning. Hartley told them she would think about it. Following that meeting, Defendant's management decided to fire her if she did not voluntarily resign. Accordingly, on April 24, 1995, Plaintiff was asked whether she had thought about her intentions. When she said she had not, she was fired.

After Plaintiff was informed that she was fired, she returned to her desk to retrieve her personal items. Among the items at her desk was a box of 4" by 6" index cards, on which Plaintiff had noted information about her clients and prospective customers, including their name, address, telephone number, contact person, and purchase data. Hertlein would not permit Hartley to take these cards, stating that the cards contained proprietary information and belonged to DCS. Hartley insisted that the cards were her personal property. Plaintiff requested that Phillip Denlinger be part of the conversation. Denlinger also stated that the customers were DSC customers, that the cards contained information about the customers and, therefore, that the cards belonged to DCS. Hartley was not permitted to leave with the cards.

## II. *Standard for Summary Judgment Motion*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of

---

**2.** The change was to be effective in early 1995. As stated in this Court's ruling (Doc. # 86), although Hartley asserts that the change was sudden, the uncontroverted evidence is that she was informed of it a number of months before she would be required to begin to work inside DCS's offices.

an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *see also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991)(The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial.")(quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judg-ment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir. 1994)("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson,* 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to

wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment....") Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. *Defendant's Supplemental Motion for Summary Judgment .*

Defendant seeks summary judgment in its favor on Counts IV through VIII of Plaintiff's Complaint, namely her claims of intentional infliction of emotional distress, tortious interference with her business, unjust enrichment/quantum meruit, breach of implied contract, and promissory estoppel.

A. *Intentional Infliction of Emotional Distress (Count IV)*

*First,* DCS asserts that it is entitled to summary judgment on Count IV, alleging intentional infliction of emotional distress. Defendant argues that the conduct of which Hartley complains does not rise to the level of "extreme and outrageous" and that Plaintiff did not suffer severe emotional distress. Hartley contends, in response, that DCS managers intentionally caused her severe emotional distress by repeatedly asking her when she was planning to resign, not replacing her assistant, taking money from her paycheck for being

a few minutes late, joking about her in the office, retaining her personal possessions after she was discharged, and repeatedly inquiring into her personal beliefs and attitudes in order to change her mind about her religion. She also argues that she suffered physical manifestations of her distress, even though she did not seek treatment. Therefore, she argues, there are genuine issues of material fact, necessitating that this Court deny Defendant's motion.

In general, it is very difficult for plaintiffs to show that they have been subjected to the tort of intentional infliction of emotional distress. *Simpkins v. Specialty Envelope, Inc.,* No. 95–3370, 1996 WL 452858 at *8 (6th Cir. Aug. 9, 1996). "It is well accepted that intentional infliction of emotional distress claims may entirely appropriately be dealt with on summary judgment or in a motion to dismiss." *Miller v. Currie,* 50 F.3d 373, 377–78 (6th Cir.1995). The Supreme Court of Ohio has defined the tort of intentional infliction of emotional distress as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Wright v. Metro-Health Medical Ctr.,* 58 F.3d 1130, 1139 (6th Cir.1995)(quoting *Yeager v. Local Union 20,* 6 Ohio St.3d 369, 453 N.E.2d 666, 671 (1983)); *Russ v. TRW, Inc.,* 59 Ohio St.3d 42, 570 N.E.2d 1076 (1991). Liability for such claims

has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Brooks v. Martin Marietta Utility Servs., Inc.,* No. 97–4068, 1998 WL 739890 (6th Cir. Oct. 8, 1998)(quoting *Yeager,* 453 N.E.2d at 671)(adopting Restatement (Second) of Torts § 46). The Ohio Supreme Court has described "serious" emotional distress as involving an "emotional injury which is both severe and debilitating. Thus, serious emotional distress may be found where a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Miller,* 50 F.3d at 378 (quoting *Paugh v. Hanks,* 6 Ohio St.3d 72, 451 N.E.2d 759, 761 (1983)). Thus, to maintain an action for intentional infliction of emotional distress, a plaintiff must prove four elements: a) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; b) that the actor's conduct was extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community; c) that the actor's actions were the proximate cause of the plaintiff's psychic injury; and d) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it. *Bellios v. Victor Balata Belting Co.,* 724 F.Supp. 514, 520 (S.D.Ohio 1989).

■■■ Construing the evidence in the light most favorable to Hartley, the Court finds no genuine issue of material fact as to the existence of extreme and outrageous conduct by Defendant. The uncontroverted evidence indicates that DCS's decisions not to replace Plaintiff's personal assistant and to deduct money from her paycheck for being a few minutes late were not focused toward Plaintiff alone but, rather, affected all sales representatives. Although distressing to Hartley, these actions were within the scope of management decisions and, as a matter of law, cannot be deemed to be "extreme" or "outrageous." Similarly, although repeatedly asking when an employee will resign, joking about her in the office, retaining her personal possessions after she was discharged, and repeatedly inquiring into an employee's religious beliefs reasonably would be upsetting to the employee, such conduct also does not rise, as a matter of law, to the level of "extreme" and "outrageous." *See, e.g., Slone v. Martin Marietta Energy Sys.,* No. 95–4182, 1997 WL 139794 (6th Cir. Mar. 26, 1997)(discharge of employee who did not return to work after company physician cleared him to return, but employee's personal physician did not authorize his return, was not extreme and outrageous conduct by employer); *Gebers v. Commercial Data Ctr., Inc.,* No. 93–4011, 1995 WL 9262 (6th Cir. 1995)(no extreme and outrageous conduct occurred when defendant changed plaintiff's job, laughed at her, avoided her, and did not assist her with her job). Finally, the holding of Bible studies on the premises, to which Plaintiff was not invited, does not rise, as a matter of law, to extreme and outrageous conduct. *See id.*

In addition, there is no evidence that Hartley suffered severe emotional distress. In describing the manifestations of her distress, Plaintiff stated that she couldn't sleep, her mind "[didn't] function as sharp as it should" and that she "just [didn't] feel well." (Hartley Depo. at 142) However, she testified that she "didn't have any physical effects that [she] couldn't cope with." (Hartley Depo. at 142) In addition, the existence of severe emotional distress is belied by the fact that Plaintiff acquired a new job quickly and returned to DCS's premises to visit her former co-workers and to provide them with printed cards announcing her new job and address. Thus, Plaintiff provided no evidence that her distress was debilitating. Accordingly, because there are no genuine issues of material fact and Plaintiff has failed to provide evidence of either extreme and outrageous conduct by DCS or of severe emotional distress, Defendant's motion for summary judgment on her claim for inten-

tional infliction of emotional distress (Count IV) is Sustained.

### B. *Tortious Interference with Plaintiff's Business (Count V)*

*Second,* Defendant requests summary judgment in its favor on Hartley's claim for tortious interference with her business relationships. Under Ohio law, a cause of action for tortious interference with business relations is made out when "... one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another, or perform a contract with another...." *Wright,* 58 F.3d at 1138, quoting *Smith v. Klein,* 23 Ohio App.3d 146, 148 n. 1, 492 N.E.2d 852 (1985); *Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 57, 379 N.E.2d 235 (1977); *see Canderm Pharmacal v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988).

In her Amended Complaint, Plaintiff alleged that DCS's retention of her 4" by 6" index cards, which contained customer information, constituted retention of her "private client list." By retaining that list, Defendant had interfered with her business relationship with those clients. In its motion for summary judgment, Defendant asserts that the information contained on the index cards is proprietary information of DCS and that Hartley did not have a business relationship with the clients other than as a sales representative for DCS. Thus, there was no business relationship with which to interfere, and DCS's retention of the cards was privileged. Plaintiff counters that she did not compile the cards for DCS but, rather, for her own use. Therefore, the client list was hers, not Defendant's.

■ The parties agree that DCS management refused to allow Hartley to take with her the 4" by 6" index cards containing information about customers and prospective customers of DCS. However, the record contains uncontroverted evidence that, in contacting the individuals and entities listed on those cards, Plaintiff acted as an employee of DCS, not as an independent contractor.[3] Plaintiff, therefore, established a business relationship with the customers and prospective customers as an employee of DCS. Plaintiff has provided no evidence that she had a business relationship, independent of her employment with DCS, with the entities and individual listed on the index cards. Accordingly, the evidence indicates that the clients and prospective clients listed on the cards were solely customers and prospective customers of DCS. Because Hartley had no independent business relationship with those customers, Defendant's retention of the index cards cannot constitute intentional interference with Plaintiff's business relationship with them.

Even if the Court were to accept Plaintiff's argument that she had an independent business relationship with the customers and potential customers listed on her cards, Plaintiff has failed to establish other elements of this cause of action. *First,* the record is devoid of evidence that DSC's actions were directed toward third parties, namely the customers or prospective customers listed on the index cards. Although DCS's retention of her cards may have hindered her ability to contact those customers, DCS did not attempt to influence directly those customers from engaging in business with her. *Furthermore,* Plaintiff has not produced any evidence that DSC's actions actually caused those customers not to continue their relationship with Hartley. Thus, Hartley has failed to show any damages. Accordingly, there are no genuine issues of material fact as to this cause of action, and Defen-

---

**3.** In her deposition, Plaintiff testified that the cards contained the names of customers and prospects that she had been attempting to turn into customers of DCS. (Hartley Depo. at 119) She further testified that kept the cards as "an idiosyncrasy. That's how I like to manage my business, thoroughly." (*Id.* at 121) By using the cards, Hartley "had access all the time of everyone [sic] of my accounts no matter where [she] was." (*Id.* at 120)

dant is entitled to judgment as a matter of law. Defendant's motion for summary judgment as to Count V, intentional infliction of emotional distress, is Sustained.

### C. Unjust Enrichment/Quantum Meruit (Count VI)

■ DCS requests summary judgment on Plaintiff's claim for unjust enrichment/quantum meruit. "An action for unjust enrichment will lie where a party retains money or a benefit that in equity or justice belongs to another." *Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 222 (6th Cir.1992), citing, *Hummel v. Hummel*, 133 Ohio St. 520, 14 N.E.2d 923, 926–27 (1938). However, absent fraud, illegality, or bad faith, a plaintiff may not recover if the defendant retains the disputed money or benefit under the terms of an agreement between the parties. *Id., Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 544 N.E.2d 920, 924 (1989); *Ullmann v. May*, 147 Ohio St. 468, 72 N.E.2d 63, 67 (1947). Quantum meruit "contains the same elements as required for recovery under unjust enrichment. The difference is the manner in which damages are computed. In unjust enrichment, damages are conferred in the amount the defendant benefitted. In quantum meruit, damages are the measure of the value of the plaintiff's services." *Loyer v. Loyer*, No. H–95–068, 1996 WL 463728, *3 (Ohio Ct.App. Aug. 16, 1996).

Hartley contends that she conferred a benefit upon DCS in four ways. *First,* she asserts that Defendant benefitted by her purchase of a computer, with which she performed work at home. *Second,* Plaintiff argues that DCS retained commissions owed to her from a sale made to Lexis–Nexis. *Third,* Hartley asserts she is entitled to restitution for DCS's use of the index cards compiled by her. *Finally,* Plaintiff asserts that Defendant has wrongfully withheld vacation pay that it owes her.

*First,* as to the computer, the facts regarding its purchase are not disputed. In 1992, Plaintiff purchased a computer from Defendant in order to facilitate performing her job at home. Defendant sold Plaintiff the computer at cost (approximately $1,300), which constituted a discount of approximately two or three hundred dollars below retail price. Hartley did not use the computer for personal items. Plaintiff retained possession of the computer after her termination.

■ These facts do not support a finding of unjust enrichment. Although Plaintiff argues that she needed a computer at home to perform adequately as an outside sales representative, Plaintiff provided no evidence that she was restricted from using the computer for personal matters, nor is there evidence that the computer was unique and could only be used to perform her job with DCS. In addition, the record further indicates that Plaintiff retains possession and ownership of the computer, which she can use as she wishes. Although Plaintiff may not have purchased the computer but for her employment with DCS, the record does not suggest that the parties engaged in anything other than a typical retail transaction for a computer.[4] Accordingly, the record is devoid of evidence of an unjust benefit to DCS. Therefore, Defendant's motion for summary judgment on this issue is Sustained.

*Second,* Hartley argues that DCS was unjustly enriched, because it failed to pay her commissions to which she was entitled from the sale of ink-jet cartridges to Lexis–Nexis. Defendant argues that no sales were made to Lexis–Nexis while Hartley was employed by DCS. Rather, "a great deal more effort went into closing the deal after she left." (Def. Mem. at 12)

---

**4.** Because Hartley purchased the computer from DCS at cost, Defendant did not receive any profit from the sale.

The evidence provided is contradictory in regard to when the sale to Lexis–Nexis was made. In her deposition, Hartley testified that no sales were actually made during her employment, but the deal had been committed to by Lexis–Nexis prior to her termination and was to commence a week following her dismissal.[5] (Hartley Depo. at 54–55) Defendant contends that a great deal more effort was required to complete the agreement with Lexis–Nexis, and that no sales took place while Hartley was employed by DCS. Defendant points out that Plaintiff admitted that she did not know what kind or how much work was required to close the deal after she was terminated by DCS. (Hartley Depo. at 57) Neither party has submitted evidence indicating the terms by which Plaintiff was entitled to commissions.

■ The evidence submitted leaves unresolved questions of fact that are pertinent to whether Plaintiff is entitled to commissions. Principally, there is a lack of evidence as to when in the negotiation process Plaintiff has earned her commission, *i.e.*, is Plaintiff entitled to commissions when there is agreement in principle, when a contract is signed, or when delivery is made? Because this Court cannot determine when Plaintiff had earned her commissions for DCS, generally, it equally cannot say that there are no genuine issues of fact regarding whether the condition on her receiving commissions had been satisfied prior to her termination. Accordingly, due to the existence of genuine issues of material fact, Defendant's motion for summary judgment as to Plaintiff's claim for unjust enrichment based on retention of earned commissions is Overruled.

*Third,* Hartley asserts that DCS has been unjustly enriched by the retention and use of her 4" by 6" index cards. Plaintiff claims that the cards were her own proprietary information which had been misappropriated by Defendant for its own use and benefit. In response, Defendant argues that the cards contained its proprietary information, which Plaintiff had acquired and accumulated as part of her employment with DCS. Accordingly, Defendant argues that the customers were DCS customers, and that Plaintiff was fully compensated for sales made to them, pursuant to their pay agreement.

■ By contending that the customer information is the property of DCS, Defendant essentially argues that the index cards contain trade secrets of DCS. Under Ohio law, trade secrets are defined as:

... the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, or improvement, or any business plans, financial information, or listing of names, addresses, or telephone numbers, which has not been published or disseminated, or otherwise become a matter of general public knowledge. Such scientific or technical information, design, process, procedure, formula, or improvement, or any business plans, financial information, or listing of names, addresses, or telephone numbers is presumed to be secret when the owner thereof takes measures designed to prevent it, in the ordinary course of business, from being

---

**5.** Hartley testified, as follows:

Q: Why do you think you are entitled to [commissions]?
A: Because it was the biggest account I ever landed while I was there, and I think it probably could have been the biggest account the company ever had, and it was interesting that it—I was fired a week before it was to have commenced.
Q: There were actually no sales made to Lexis–Nexis while you were at DCS, were there?
A: Correct, I didn't have a chance.
Q: And you said it was the biggest account you've landed. That deal wasn't actually closed before you left, was it?
A: It was ready to start as far as the shipment the next week, yes, it was committed to before I left.
Q: It's your recollection that those negotiations were completed before you left?
A: Yes.
(Hartley Depo. at 54–55)

available to persons other than those selected by the owner to have access thereto for limited purposes.

Ohio Rev.Code Ann. § 1333.51(A)(3). Whether information is a trade secret is a factual determination to be made by the trial court. *Water Management, Inc. v. Stayanchi,* 15 Ohio St.3d 83, 86, 472 N.E.2d 715 (1984). In applying Ohio Rev. Code Ann. § 1333.51(A)(3), a trial court should "examine those facts which show the extent to which the information is known outside the business and the precautions taken to guard the secrecy of the information." *Water Mgmt.,* 15 Ohio St.3d 83, 472 N.E.2d 715 (syllabus). In determining whether a client list constitutes a trade secret, a court may consider: 1) the extent to which the information is known outside the business; 2) the extent to which it is known to those inside the business; 3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; 4) the savings effected and the value to the holder in having the information as against a competitor; 5) the amount of effort or money expended in obtaining and developing the information; and 6) the amount of time and expense it would take for others to acquire and duplicate the information. *See Pyromatics, Inc. v. Petruziello,* 7 Ohio App.3d 131, 134–35, 454 N.E.2d 588 (1983) (citations omitted). A client list may constitute a trade secret. *See Mesarvey, Russell & Co. v. Boyer,* No. 91AP–974, 1992 WL 185656 (Ohio Ct.App. July 30, 1992) ("Whether created from a writing or from memory, a client list is a statutory trade secret under R.C. 1333.51(A)(3).")(enjoining former employee from using client list, created from his memory, to solicit MRC clients); *Sonkin & Melena Co. v. Zaransky,* 83 Ohio App.3d 169, 614 N.E.2d 807 (1992)(client list was not trade secret when law firm did not request return of the list after employee left the firm's employment, and there was no evidence that contract of employ-

ment stipulated that use of names after leaving employment constituted violation of trade secret laws).

In asserting that the cards are her own proprietary information, Plaintiff focuses on the creation of the cards, not the information they contain.[6] Plaintiff's argument is misguided. The relevant question is whether the information on the cards are trade secrets, which DCS had a right to protect, or information which Hartley could take with her.

■ The relevant evidence in the record establishes as a matter of law that the information on the cards is trade secrets. DCS's employee manual states that DCS considered its customer information to be confidential. It reads, with regard to confidential information, in pertinent part:

Company business information is confidential to our company and authorized employees. Discussion, relaying, or possession or confidential business information, without the instruction of, or without prior management approval, is cause for immediate dismissal and probable criminal and civil prosecution. To protect this information and it's [sic] use after separation, the company require employees in selected job classifications to execute employment contracts.

All information concerning employees (including rate of pay) and customers is to be kept strictly confidential.

(Pl. Mtn. Summ. J. Ex. 6 at 2–3) Furthermore, the parties agree that Defendant attempted to keep the information within the company by disallowing Plaintiff to take the information with her. Plaintiff has provided no evidence indicating that the client information was of general public knowledge or that Defendant has allowed employees to take client information with them after separation from employment with DCS. Accordingly, there is no genuine issue of fact that the customer

---

**6.** As noted above, Plaintiff asserts that DCS did not require her to create the cards but, rather, it used a computer system to track its customers. Hartley claims that she created the cards for her own use and, therefore, the cards are not the property of DCS.

information constitutes trade secrets of DCS, not Plaintiff's own proprietary information.

██ Assuming, *arguendo*, that the information on the index cards does not constitute trade secrets and that Hartley could rightfully have retained possession of the cards, Plaintiff has not demonstrated that Defendant's retention of them resulted in an unjust benefit to DCS. Plaintiff's deposition testimony indicates that DCS's customer account records are computerized, and that DCS could create a printout of purchases by any particular client in a given time. (Hartley Depo. at 120) Plaintiff has not provided evidence of, nor argued in her brief, how the cards provided information to DCS that it did not have in its computer system. Moreover, even if the cards contained additional client information, Plaintiff acquired that information as an employee of DCS and for DCS. *See* discussion of tortious interference with business relationship, *supra*. Because Hartley acquired the customers and potential customers listed on the cards for DCS, the record contains no evidence indicating how retention of information about them by Defendant is unjust. Accordingly, Plaintiff has failed to provide evidence to support her claim of unjust enrichment as it pertains to the retention of her index cards. Defendant's Motion for summary judgment as to this claim is Sustained.

*Finally,* Plaintiff asserts that Defendant has wrongfully withheld vacation pay for 1994. Hartley argues that because she was employed for the 1995 calendar year until April, she was hired on or about May, 1992, and she worked the entire year ending December, 1994, she is entitled to complete compensation for earned vacation time. (Pl.'s Mem. Opp. to Summ. J. at 12) Defendant refutes this, stating that she has already been paid for all unused vacation time to which she is entitled.

Both parties point to the provision in DCS's employee manual regarding accumulation of vacation time. (Pl.'s M. Summ. J., Ex. 6 at 11; Hartley Depo. Ex.

B at 11) That provision, entitled Accumulation Rights, reads, in pertinent part:

Paid Vacation time shall be accumulated during the calendar year beginning January 1 thru December 31 according to the stated schedule.

All accumulated time must be taken as Vacation during the calendar year in which it is accumulated. Any time not taken by December 31 shall be lost and will not carry over to the next year. In the event of a "special situation", Dayton Computer Supply may grant an employee the right to carry over accumulated time into the next Vacation year. These requests will be reviewed on an individual basis by your supervisor, and must be requested at least 6 months in advance.

*Id.* The employee manual unambiguously indicates that, absent "special situations," the vacation time that Plaintiff accrued in 1994 would have been forfeited if it remained unused by the end of that year. Plaintiff has provided no evidence that she had made arrangements with management, due to a "special situation," for her 1994 vacation time to carry over into 1995. Accordingly, the evidence unequivocally shows that Plaintiff was not entitled to payment of unused vacation time from 1994. In addition, Defendant provided evidence that Plaintiff was paid for all the vacation time she accrued in 1995. (Hertlein Aff. ¶ 31) Plaintiff provided no evidence to contradict this. Accordingly, the undisputed evidence demonstrates that Plaintiff was fully compensated for her unused leave in 1995. The Court, therefore, concludes that there are no genuine issues of material fact as to the existence of vacation time for which Plaintiff has not been compensated. Because Plaintiff has been fully compensated for her accrued vacation time, Plaintiff has not demonstrated that Defendant has been unjustly enriched. Defendant's Motion for summary judgment as to Plaintiff's claim of unjust enrichment/quantum meruit based on unpaid vacation time is Sustained.

In summary, Defendant's Motion for summary judgment is Sustained as to Plaintiff's claims of unjust enrichment and quantum meruit (Count VI) based on her purchase of a computer, withheld vacation pay, and retention of her index cards. Defendant's Motion as to Count VI is Overruled regarding the commissions due to the sale of ink-jet cartridges to Lexis-Nexis.

### D. Breach of Implied Contract (Count VII)

*Next*, Defendant requests summary judgment on Hartley's claim of breach of implied contract. Under Ohio law, it is well settled that "[u]nless otherwise agreed, either party to an oral employment-at-will agreement may terminate the relationship for any reason which is not contrary to law." *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985). However, the facts and circumstances of employment may create an implied employment contract. As stated by the Sixth Circuit in an unreported opinion,

[a]lthough the at-will rule remains the law in Ohio, the facts and circumstances surrounding an oral employment-at-will agreement, including the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question, can be considered by the trier of fact in order to determine the agreement's explicit and implicit terms concerning discharge. 483 N.E.2d at 154. Important in such a determination is what is set out in an employment manual given to employees. *See Jones v. East Center For Community Mental Health, Inc.*, 19 Ohio App.3d 19, 482 N.E.2d 969 (1984) ("an employ-

ment manual which promises fair treatment and which purports to limit the employer's right to terminate at will," may constitute a binding employment contract to terminate only for certain reasons).

*Scheid v. Fanny Farmer Candy Shops, Inc.*, No. 89–3046, 1990 WL 130483, *1–2 (6th Cir. Sept. 11, 1990).

Plaintiff asserts that DCS continuously represented to her that her employment would continue if she worked overtime without pay and made sufficient sales, as her position required. Based on those representations, Plaintiff contends that she could only be terminated for just cause.[7] In support of her argument, Hartley cites to her deposition transcript in which she testified about the nature of the representations made by DCS. However, the cited passage indicates that DCS made no representations that she would have job security if particular requirements were met:

Q: Ms. Hartley, your complaint in this lawsuit, the pleadings in this lawsuit allege among other things that there were promises of job security made to you. What specific promises were made to you about job security or future employment?

A: The promises in my opinion are implied promises that, you know, I've got this job. If I make my sales, if I do a good job. I was always professional. I worked hard. I was ethical. I was the best rep that they had. The only quarter in the only history of the company when they had a bonus program, I was the only one who qualified based on my job.

---

7. In her memorandum opposing summary judgment, Plaintiff asserts that she falls within the exception to at-will employment set forth in *Greeley v. Miami Valley Maintenance Contractors, Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981 (1990)(holding that public policy warranted exception to employment-at-will doctrine when employee is discharged for a reason prohibited by statute, and that cause of action for wrongful discharge in violation of public policy may be brought in tort). In doing so, Plaintiff essentially asserts that she was discharged in contravention of public policy. However, Plaintiff's Complaint does not assert the cause of action of wrongful discharge in contravention of public policy. Accordingly, that argument is inapposite and will not be addressed.

Q: You thought if you did a good job, why would you be fired?

A: Yes, why would I not?

Q: Did anyone ever tell you specifically you will have a job with us for good as long as you do X, Y, and Z?

A: No.

Q: Did anyone tell you that your job would be—would depend solely on your sales as opposed to any other aspects of employment?

A: No, and I'm pretty aware of what it takes to be a good employee and to provide for my company the customers that they want. In other words, I always felt like I really worked well for the customers in that my owners were benefiting [sic] because of the way I handled my accounts, and who would have a complaint about that?

(Hartley Depo. at 18–19) Plaintiff's own testimony, therefore, refutes that any representation regarding continued employment was made by Defendant to her.

██ The Employee Manual, dated May 9, 1994, also indicates that DCS did not intend to create an employment contract, express or implied. It states, in pertinent part:

Employment at Dayton Computer Supply is "at will" and can be terminated at any time by either the employer or employee for any reason other than race, religion or gender. It is understood that this employee's manual constitutes a guideline for employee and employer responsibilities and is not an employment contract.

(Hartley Depo. Ex. B at 2) Thus, Plaintiff could not look to the employee manual as creating an implied contract of employment. The evidence submitted to the Court, therefore, provides no basis for the existence of an implied contract of continued employment. Accordingly, there are no genuine issues of material fact as to the existence of an implied contract. Defendant is entitled to judgment as a matter of law on this claim. Defendant's motion for summary judgment as to Count VII of Plaintiff's Complaint, asserting breach of implied contract, is Sustained.

**E.  Promissory Estoppel (Count VIII)**

██ *Finally,* Defendant seeks summary judgment on Plaintiff's claim of promissory estoppel. Ohio recognizes a promissory estoppel exception to the at-will employment doctrine. *Scheid v. Fanny Farmer Candy Shops, Inc.,* No. 89–3046, 1990 WL 130483, *1–2 (6th Cir. Sept. 11, 1990); *Jones, supra.* To establish that the doctrine of promissory estoppel has modified an employment-at-will relationship, an employee must prove that: (1) the employer made a clear, unambiguous promise; (2) the employer should have reasonably expected the promise to induce action or forbearance on the part of the employee; (3) the promise actually induced action or forbearance that was detrimental to the employee; and (4) enforcement of the promise is necessary to avoid injustice. *Fisher v. Trinova Corp.,* No. 96–3918, 1998 WL 774111 at *9 (6th Cir. Oct. 13, 1998); *Mers,* 483 N.E.2d at 155; *Snyder v. Ag Trucking, Inc.,* 57 F.3d 484, 488 (6th Cir. 1995). To recover under this theory, the employee must prove reliance on a specific, discrete promise relating to job security. *Wing v. Anchor Media, Ltd.,* 59 Ohio St.3d 108, 570 N.E.2d 1095, 1098 (1991) ("Standing alone, praise with respect to job performance and discussion of future career development will not modify the employment-at-will relationship. A demonstration of detrimental reliance on specific promises of job security can create an exception to the employment-at-will doctrine.")(quoting *Helmick v. Cincinnati Word Processing, Inc.,* 45 Ohio St.3d 131, 543 N.E.2d 1212, 1213 (1989)); *Fisher,* 1998 WL 774111 at *9.

██ Plaintiff has not provided evidence to support any of the elements of this claim. The record contains no evidence that Defendant made a clear promise of continued employment. Although her brief asserts that she was promised contin-

ued employment in exchange for extra work, Hartley does not cite to any evidence in the record to support that contention. To the contrary, Plaintiff acknowledges that no one told her that she would retain her job so long as she did specific things.[8] *See Glavaski v. Master Builders,* 1997 WL 668955 at *4 (6th Cir.1997)(summary judgment proper where defendant never promised long-term employment and plaintiff admitted that defendant's promises were unclear). Thus, there are no issues of material fact as to the existence of a promise of job security. Because there is no evidence of a promise, Plaintiff's claim of promissory estoppel must fail.

In her memorandum, Plaintiff focuses on her actions in reliance of continued employment with DCS. She asserts that she engaged in a number of activities in reliance on continued employment, including working overtime, purchasing a computer to do work at home, incurring certain living expenses, and acquiring over 600 clients. Although her claim fails for lack of a clear, specific promise, the Court notes that she has also failed to provide evidence that those actions were in reliance upon a promise, as opposed to an expectation, of continued employment and were to her detriment. As an commissioned employee, Hartley was compensated for sales made, not for hours worked. By working overtime and garnering a substantial client-base, Plaintiff presumably earned substantially more than if she had worked standard hours and obtained fewer clients for DCS. Although Plaintiff states that she had to acquire a computer in order to work at home, she further asserts that she was more successful generating commissions while she worked at home.

Thus, having the computer allowed her to work from home, which was to her benefit. Finally, Hartley failed to provide evidence that she incurred living expenses that she would not otherwise have incurred absent a specific promise of continued employment. Plaintiff, therefore, failed to provide evidence that she detrimentally relied upon a promise of continued employment.

Accordingly, Plaintiff has not demonstrated that a genuine issue of material fact exists as to the existence of a promise of job security or to reliance on such a promise. Defendant's motion for summary judgment as to Plaintiff's claim of promissory estoppel (Count VIII) is Sustained.

For the foregoing reasons, Defendant Dayton Computer Supply's Supplemental Motion for Summary Judgment as to Counts IV, V, VII and VIII is Sustained. Defendant's Motion is Overruled in Part and Sustained in Part as to Count VI.

As a result of the rulings contained herein, the following causes of action remain in this litigation: Plaintiff's claims of discrimination on the basis of her sex, age, and religion, in violation of Chapter 4112, when Defendant twice failed to promote her to the position of sales manager (Counts I through III); and her claim of unjust enrichment/quantum meruit as it pertains to commissions she may have earned from the sale of ink-jet cartridges to Lexis–Nexis (Count VI). Defendant has filed its Second Supplemental Motion for Summary Judgment (Doc. # 87), pertaining to the claims of discrimination due to DCS's failure to promote Plaintiff to the position of sales manager.[9] The Court will rule on that Motion shortly.

8. As noted, *supra,* Hartley acknowledged, in her deposition, that no specific promises were made. (Hartley Depo. at 18–19)

9. In its Motion for Summary Judgment (Doc. # 56), Defendant did not address, in any detail, its contention that it is entitled to summary judgment on these claims. Rather, Defendant had argued that Plaintiff had failed to exhaust her administrative remedies with respect to her failure to promote claims. In addition, Defendant had asserted, in conclusory language, that Hartley was not qualified for the position of sales manager. The Court granted Defendant's Motion as to her federal law claims for failure to promote, based on Plaintiff's failure to exhaust administrative remedies. As to the state law claims for fail-

Counsel listed below will take note that a telephone conference call will be had, beginning at 8:50 a.m., on Thursday, February 4, 1999, for the purpose of setting a trial date and other dates leading to the resolution of this litigation. Among the topics to be discussed is whether the Court, due to the absence of any remaining federal law claims, should dismiss this case, without prejudice, to be refiled in state court.

ure to promote, the Court granted Defendant twenty (20) days from the date of the Decision to renew its request for summary judgment, with a properly supported motion establishing its entitlement to same.