SONKIN & MELENA CO., L.P.A., Appellee and Cross–Appellant,

v.

ZARANSKY, Appellant and Cross–Appellee.

[Cite as *Sonkin & Melena Co., L.P.A. v. Zaransky* (1992), 83 Ohio App.3d 169.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 61057.

Decided Oct. 19, 1992.

*Baker & Hostetler* and *Thomas H. Shunk,* for appellee and cross-appellant.

*Bernard, Haffey & Bohnert Co., L.P.A., J. Ross Haffey* and *Scott H. Schooler,* for appellant and cross-appellee.

HARPER, Judge.

## I

Appellant, Stephen Zaransky, appeals from the judgment of the Cuyahoga County Court of Common Pleas, raising three assignments of error challenging the trial court's award of damages.

Sonkin & Melena Co., L.P.A. "(Sonkin & Melena") cross-appeals from the same judgment, also raising three assignments of error challenging the trial court's failure to award compensatory and punitive damages.

We affirm Zaransky's appeal in part and reverse in part, and affirm Sonkin & Melena's cross-appeal.

## II

Sonkin & Melena is a legal professional corporation with its office in the city of Cleveland, Ohio. Although its practice includes other areas of law, a substantial part of Sonkin & Melena's practice is in the areas of workers' compensation and personal injury. The workers' compensation practice at Sonkin & Melena had been built up over a period of twenty-five years. Zaransky worked for the Ohio Bureau of Workers' Compensation for a couple of years after graduation from law school in 1979. He was hired in October 1981 by Sonkin & Melena as an associate in the workers' compensation department.

Zaransky did not come to Sonkin & Melena with any clients of his own. He was instructed and trained in the handling of workers' compensation claims at Sonkin & Melena. He was eventually placed in charge of the day-to-day operations of the workers' compensation practice there, which increased from year to year. There was testimony that many clients came to the firm because of their desire to be represented by Zaransky.

Zaransky, by virtue of his employment, had unrestricted access to all information regarding the firm's workers' compensation clients, which was maintained in

the firm's computer data base. This information included clients' names, addresses and telephone numbers, claim numbers, date and nature of injuries. Zaransky testified he supervised in the creation of the data base.

The parties testified that the substantial part of the legal work involved in workers' compensation representation is done in the early part of the representation. It includes the initial interview and the efforts to obtain the allowance of the claim as work-related. Once the initial work is completed, the remaining work is a matter of sending forms to various people involved in the claim. Even though most of the work is done by the firm in the early days of the representation, the award to the client often takes from six months to one and one-half years to recover.

In 1987, Mr. Sonkin, who is a partner in the firm, approached Zaransky and informed him that he would like him as a partner in the firm. On December 18, 1987, Zaransky informed Sonkin that he was not satisfied with the uncertainties in the benefits and responsibilities of being a partner in the firm and would prefer to stay on at a salary of $75,000 per year. At the time of the conversation, Zaransky was paid $48,000 per year. Sonkin was not pleased with Zaransky's request; however, both parties agreed to discuss the matter at a later time.

On December 19, 1987, Sonkin and Zaransky again discussed Zaransky's employment. There was no agreement reached, but they agreed to think about the matter further during Sonkin's vacation, which was scheduled to begin on December 20, 1987 and end on January 11, 1988. Sonkin was led to believe that Zaransky's request would be further discussed upon his return from vacation.

Prior to January 12, 1988, Zaransky discussed with Brad Zelasko the issue of renting office space for his new practice. He purchased a desk and a chair for his new practice; caused announcements of his new practice and his new office space to be printed up by a professional printer; retained a copy of the client claim list, current as of mid–1987, at his residence; and retained copies of various forms he had used in the workers' compensation practice at Sonkin & Melena.

On January 12, 1988, Zaransky informed Sonkin upon his return from vacation that he was terminating his employment, effective that date. Zaransky's decision to leave the firm was made prior to January 6, 1988. Even though Zaransky made his decision to leave prior to informing Sonkin on January 12, 1988, he did not convey his intention to leave the firm to either Sonkin or Donald Melena, the other principal in the firm. He also did not return the client claim list, maintained at his residence, to the firm.

After leaving the firm on January 12, 1988, Zaransky used the client claim list he obtained from Sonkin & Melena to send announcements of his solo practice and new location to over three hundred individuals on the list who were active clients with active claims. He promised the clients who contacted him that if

they retained him, they would pay only one lawyer's fee. These promises were made in spite of Zaransky's knowledge that the individuals had a contingency fee arrangement with Sonkin & Melena. He advised them that he would "work for free on their case if that's what the court decided." Zaransky's efforts led more than two hundred clients of Sonkin & Melena to retain him as their attorney to complete their workers' compensation claims.

Zaransky obtained from each client who switched legal representation to him a power of attorney which he filed with the Bureau of Workers' Compensation. These filings resulted in the checks representing clients' awards being sent to Zaransky rather than Sonkin & Melena. The contingency fees from these awards were deposited at Zaransky's discretion in either a trust account or a general business account. The fees deposited into the trust account consisted of the fees generated by an award to former Sonkin & Melena clients. All other fees were deposited into Zaransky's general business account.

Sonkin & Melena presented testimony which shows that the total amount in the trust account was attributable to the investigative groundwork, interview of the client and preparation and filing of the applications for award done by the firm and Zaransky. There was no evidence presented which shows what task was performed by Zaransky or the firm on a given file. No client testified as to when work was done on his or her case.

At the time of the trial, the total amount in the trust account was $140,914.87. Sonkin & Melena testified also that it advanced a total of $8,572 to clients who switched representation to Zaransky and has not been reimbursed.

The parties agreed that they would not seek recovery from clients regarding the disputed fees to prevent any client from paying more than one legal fee as a result of the court action.

Irv Chessler, Sonkin & Melena's accountant, testified that the firm lost income in the amount of $459,405 from its workers' compensation practice in the two years following Zaransky's departure.

William Crosby, an attorney who practices in the workers' compensation field, testified that "if you do most of the work, you get all the fees." Otherwise, the fee is divided among the prior and the new attorneys on a *quantum meruit* basis.

Appellant Zaransky's assignments of error are as follows:

"I. The trial court erred in awarding $149,486.87 in quantum meruit compensatory damages to Sonkin & Melena Co., L.P.A., because it did not present any evidence as to how much work it performed for clients in relation to any of the disputed files.

"II. The trial court erred in awarding $149,486.87 in compensatory damages to Sonkin & Melena Co., L.P.A. which it awarded out of a trust fund set up to

resolve workers' compensation attorney-client fee disputes where the trial court was without subject matter jurisdiction to decide how monies in the trust accounts should be divided up, as any such determination must first be made by the Industrial Commission.

"III. The trial court erred in awarding $149,486.87 in compensatory damages to Sonkin & Melena Co., L.P.A. which it awarded out of a trust fund set up to resolve attorney-client fee disputes, because the clients whose attorney fees make up the trust fund were indispensable and were not parties to the litigation."

Appellant argues in his first assignment of error that the trial court could not award any fees to Sonkin & Melena under the doctrine of *quantum meruit* because it did not present any evidence as to how much work it performed. We disagree because it is our opinion that appellant does not have a complete understanding of the application of the doctrine of *quantum meruit*. Black's Law Dictionary (6 Ed.1990) 1243, defines *"quantum meruit"* as "as much as deserved." It was historically a common count in the action of assumpsit, which allowed recovery "for services performed for another on the basis of a contract implied in law or an implied promise to pay the performer for what the services were reasonably worth." *In re Voss Estate* (1963), 20 Wis.2d 238, 121 N.W.2d 744. Thus, *quantum meruit* is a doctrine derived from the natural law of equity, the basic concept of which is that no one should be unjustly enriched who benefits from the services of another. In order to prevent such an unjust enrichment, the law implied a promise to pay a reasonable amount for the services rendered and even for materials furnished, in the absence of a specific contract. See *Swift-ships, Inc. v. Burdin* (La.App.1976), 338 So.2d 1193, 1195.

The essential elements of recovery under *quantum meruit* are:

"(1) Valuable services were rendered or materials furnished, (2) for the person sought to be charged, (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him, (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services was expecting to be paid by the person sought to be charged." *Montes v. Naismith & Trevino Constr. Co.* (Tex.Civ.App.1970), 459 S.W.2d 691, 694. See, also, *Colbert v. Dallas Joint Stock Land Bank* (1941), 136 Tex. 268, 150 S.W.2d 771.

Until recently, Ohio has not followed other jurisdictions in recognizing the application of the doctrine of *quantum meruit* to a discharged attorney as a measure of damages regardless of whether there was cause for discharge. In overruling the old cases that held otherwise (*Scheinesohn v. Lemonek* [1911], 84 Ohio St. 424, 95 N.E. 913; *Mahoning Cty. Bar Assn. v. Ruffalo* [1964], 176 Ohio St. 263, 27 O.O.2d 161, 199 N.E.2d 396; *Roberts v. Montgomery* [1926], 115 Ohio St. 502, 154 N.E. 740), the Ohio Supreme Court held in *Fox & Assoc. Co. v.*

*Purdon* (1989), 44 Ohio St.3d 69, 72, 541 N.E.2d 448, 450, that "where an attorney is discharged by a client with or without just cause, and whether the contract between the attorney and client is express or implied, the attorney is entitled to recover the reasonable value of services rendered prior to the discharge on the basis of *quantum meruit.* See *Fracasse v. Brent* (1972), 6 Cal.3d 784, 100 Cal.Rptr. 385, 494 P.2d 9.

"The new rule strikes the proper balance by providing clients greater freedom in substituting counsel, and in promoting confidence in the legal profession while protecting the attorney's right to be compensated for services rendered."

█ The evidence in the instant suit shows that Sonkin & Melena contracted to represent the individuals whose cases generated the funds in the trust account. It is also uncontroverted that Sonkin & Melena was discharged by those clients when they switched representation to Zaransky. Since those clients did not pay Sonkin & Melena for its services before and after they switched representation, and since it is within their right to hire a new attorney if they wished, the law of equity forbids them from unjustly enriching themselves from the services of Sonkin & Melena. The trial court, therefore, properly applied the doctrine of *quantum meruit* to require the clients to pay for the benefits they received from the services of Sonkin & Melena with the fund held in trust by Zaransky.[1] Therefore, Sonkin and Melena do not have to·show how much work it performed in order to be awarded fees under *quantum meruit.* All it has to show is evidence that it performed some services for its clients' benefit and was not paid for the services.

█ Having decided that the application of the doctrine of *quantum meruit* was proper, we must now decide whether under the evidence presented, Sonkin & Melena is entitled to the entire amount of the trust fund. Appellant argues that there was no evidence on the record that warrants the trial court to award all the funds in the trust account to Sonkin & Melena. We agree. Generally, a party who establishes his right to be compensated on *quantum meruit* should recover only as much as he reasonably deserves for his services, and no more. Thus, the amount which he can recover on *quantum meruit* is subject to a double limitation: (1) plaintiff cannot recover more than the actual value of the services rendered for defendant, including the value of materials and fair profit if and when applicable; and (2) plaintiff cannot recover more than the amount defendant was enriched by his rendering of services.

---

1. It is noteworthy that the attorneys involved have agreed that the clients would not be sued or required to pay more than a one-time fee, thereby waiving any claims against the clients except for the amount in the trust fund which were deposited as payments for the legal services rendered.

In the instant case, the only evidence adduced at trial was the testimony of attorney William Crosby, who testified that "if you do most of the work, you get all of the fees." There was further testimony that a substantial part of the legal work involved in workers' compensation claims is done early in the course of representing the client. However, all this evidence notwithstanding, a party seeking to recover a specified amount of money under *quantum meruit* must prove the actual value of the services he rendered to defendant. The mere statement that a "substantial part" of the legal work was done in the early stage of the representation is insufficient to warrant an award of one hundred percent of the fees without proof that the party in question actually performed one hundred percent of the services. Since there is evidence to show that Zaransky could have performed some services that were worth being paid for, we shall remand this cause to the trial court to determine the actual fees payable to Sonkin & Melena and Zaransky for their respective services.

Appellant's first assignment of error is overruled as to his challenge on the application of the law but sustained as to his challenge on the actual monetary award.

## III

Appellant argues in his second assignment of error that the trial court was without subject matter jurisdiction to award any damages to Sonkin & Melena. Appellant contends that a fee dispute between attorneys and their clients should be resolved by the Ohio Industrial Commission or by the Bureau of Workers' Compensation. Appellant, in an attempt to bolster his arguments, cites Ohio Adm.Code 4123–3–24 and R.C. 4123.06, which read in pertinent part respectively as follows:

Ohio Adm.Code 4123–3–24:

"When a controversy exists between a party and his representative concerning fees for services rendered in industrial claims, either the party or the representative may make a written request to the commission to resolve the dispute. Such request must be completed and filed in accordance with the rules of the industrial commission, the matter being within the exclusive jurisdiction of the industrial commission."

R.C. 4123.06:

"The industrial commission shall make rules concerning the payment of attorney fees and shall protect parties against unfair fees. The commission shall fix the amount of fees in the event of a controversy in respect thereto. The commission and the bureau of workers' compensation shall prominently display in all areas of an office which claimants frequent a notice to the effect that the commission has statutory authority to resolve fee disputes."

Appellant's argument has no merit. The language of the Administrative Code and the statute is plain on its face. The fee controversy has to be between the attorney and his client. It does not apply to a controversy between two attorneys regarding a representation of the same client, where the client has paid the fees to the attorney being sued.

Appellant's second assignment of error is overruled.

## IV

 Appellant argues in his third assignment of error that the trial court erred in awarding fees to appellee where "the clients whose attorney fees make up the trust fund were indispensable and were not parties to the litigation." Appellant argues that nothing in the record prevents either Sonkin & Melena or himself from attempting to collect the disputed fees from the clients, thereby subjecting the clients to double charges for attorney fees. We disagree for the following reasons. First, pursuant to Civ.R. 12(H), a defendant waives the right to force the joinder of a person needed for just adjudication under Civ.R. 19(A) if he does not timely object to the nonjoinder. *Motorists Mut. Ins. Co. v. Bates* (1972), 34 Ohio Misc. 1, 63 O.O.2d 19, 295 N.E.2d 445. In the instant case, the record shows that appellant neither filed a motion requesting a joinder nor objected to a nonjoinder. Appellant, therefore, waived his right to raise it on appeal. Second, we do not agree with appellant that the clients were indispensable parties whose rights would be jeopardized if not joined in the lawsuit. Appellee's complaint was decided under *quantum meruit* and the attorneys cannot recover more than the value of the services rendered. There is, therefore, no other legal theory left open under which the attorneys can recover for the same services twice from the clients. A recovery under *quantum meruit* is a complete bar to any subsequent claim for the same services. Appellant's third assignment of error is overruled.

The trial court's judgment is affirmed on all theories of law but reversed and remanded to *only* determine properly the percentage of services rendered by Sonkin & Melena and Zaransky and to award service fees accordingly, including a reimbursement of the exact amount of the out-of-pocket advances made to the clients by Sonkin & Melena.

## V

Sonkin & Melena, on cross-appeal, has the following assignments of error:

"Error No. 1: The Court erred in failing to find that Defendant had engaged in tortious interference with Plaintiff's contracts.

"Argument: The facts upon which the Court awarded damages to Plaintiff for unjust enrichment required a judgment in favor of Plaintiff on the claim for tortious interference with Plaintiff's contracts.

"Error No. 2: The Court erred in failing to award Plaintiff compensatory damages for lost profit.

"Argument: The evidence of lost profit was sufficiently definite to support a verdict in that regard and no contrary evidence·was presented.

"Error No. 3: The Court erred in failing to award Plaintiff punitive damages.

"Argument: Defendant's actions were an intentional violation of Ohio criminal law and therefore demanded an award of punitive damages."

■ Sonkin & Melena argues in its first assignment of error that the trial court erred by its failure to award damages for tortious interference with its contracts. Sonkin & Melena argues that Zaransky interfered with the contract with its clients by inducing them not to pay the contingent fees owed on the fee arrangements.

The Ninth District Court of Appeals held in *Juhasz v. Quik Shops, Inc.* (1977), 55 Ohio App.2d 51, 9 O.O.3d 216, 379 N.E.2d 235, that:

"The tort of 'business interference' occurs when a person, without a privilege, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship, or perform a contract with another." *Id.* at paragraph two of the syllabus.

The court continued:

"In order to determine the existence of a privilege the finder of facts must consider: (a) the nature of the actor's conduct; (b) the nature of the expectancy with which his conduct interferes; (c) the relation between the parties; (d) the interest sought to be advanced by the actor; and (e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." *Id.* at paragraph three of the syllabus.

The uniqueness of an attorney/client relationship and the freedom of the client to fire his attorney coupled with the totality of the circumstances of this case make it difficult to agree with Sonkin & Melena's argument that interference occurred. The clients in question were working with Zaransky on the cases before he left the employment of Sonkin & Melena. It is neither a violation of the Disciplinary Rules, see DR 2–102, nor a contractual interference for Zaransky to inform those same clients that he no longer worked for Sonkin & Melena. The subsequent decision of those clients to leave Sonkin & Melena and hire Zaransky is within their rights. See *Fox & Assoc. Co., supra.*

Sonkin & Melena attempted to bolster its argument of inducement by citing the trial court's finding that:

"Mr. Zaransky promised each client who contacted him subsequent to January 12, 1988 that if they retained him, they would only have to pay one lawyer's fee, even though Mr. Zaransky was aware that each such client had a contingency fee arrangement with Sonkin & Melena. Indeed, he advised them that he would 'work for free on their case if that's what the Court decided.'"

The promise is in agreement with our decision in Zaransky's challenge. In the overall analysis of this case, the clients can only pay one attorney fee, even though the fee might be split among as many attorneys as has legitimate claims for their services. We, therefore, do not see the promise to the clients as rising to the level of interfering with a contractual arrangement between Sonkin & Melena and the clients. Sonkin & Melena, in an unsuccessful attempt to separate an attorney/client contract from fee arrangement, argues that:

"It was not Defendant's interference in the attorney/client relationship, but Defendant's interference in the fee arrangements, that served as the basis for Plaintiff's claim."

This argument is equally unpersuasive. One cannot interfere with a fee arrangement in a contract without interfering with the contract itself, because one is indistinct from the other. In the instant case in particular, where Sonkin & Melena would be allowed to recover the benefits of its services, a holding that interference occurred would amount to an indirect upset to a settled rule that a client is free to fire his attorney as long as the attorney is paid for the services rendered. Accordingly, Sonkin & Melena's first assignment of error is overruled.

## VI

Sonkin & Melena, in its second assignment of error, argues that the trial court erred by not awarding compensatory damages for lost profit. Appellant argues that it lost income in the two years that Zaransky left its employment. This argument has no merit. While we sympathize with Sonkin & Melena that it might have suffered from the loss of one of its trusted employees, we cannot upset the trial court's decision without a showing that Zaransky should not have left when he did. See *Gahanna v. Eastgate Properties, Inc.* (1988), 36 Ohio St.3d 65, 521 N.E.2d 814. Assuming, *arguendo*, that Zaransky's departure violated his contract of employment with Sonkin & Melena, the measure of damages would not be loss of profit but payment in lieu of departure for the remaining time he would have remained in the firm's employment pursuant to their contract. Since Zaransky was not a perpetual employee of Sonkin & Melena by contract (assuming that such is possible), the loss of potential clients and profit due to his departure is not recoverable under any legal theory; this reason explains why

businesses do whatever it takes to keep their valued employees, because outside an agreement to the contrary, "it is a free country." We also cannot contemplate in the within case an award based on a loss of profit without any evidence of a breach of contract. Sonkin & Melena's second assignment of error is overruled.

## VII

Sonkin & Melena, in its third assignment of error, argues that the trial court should have awarded punitive damages against Zaransky. It argues that Zaransky obtained the computerized list of its clients for his own use. Sonkin & Melena further argues that the client list was a trade secret that was protected under R.C. 1333.51. R.C. 1333.51 reads in pertinent part as follows:

"(A) * * *

" * * *

"(3) 'Trade secret' means the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, or improvement, or any business plans, financial information, or listing of names, addresses, or telephone numbers, which has not been published or disseminated, or otherwise become a matter of general public knowledge. Such scientific or technical information, design, process, procedure, formula, or improvement, or any business plans, financial information, or listing of names, addresses, or telephone numbers is presumed to be secret when the owner thereof takes measures designed to prevent it, in the ordinary course of business, from being available to persons other than those selected by the owner to have access thereto for limited purposes.

" * * *

"(C) No person, having obtained possession of an article representing a trade secret or access thereto with the owner's consent, shall convert such article to his own use or that of another person, or thereafter without the owner's consent make or cause to be made a copy of such article, or exhibit such article to another."

This court in *Scully v. Cleveland Stevedore Co.* (Apr. 11, 1991), Cuyahoga App. No. 58397, unreported, 1991 WL 53885, cited the Ohio Supreme Court decision in *Water Mgt., Inc. v. Stayanchi* (1984), 15 Ohio St.3d 83, 15 OBR 186, 472 N.E.2d 715, paragraph two of the syllabus, where the court held that:

"Applying R.C. 1333.51(A)(3), a trial court should examine those facts which show the extent to which information is known outside the business and the precautions taken to guard the secrecy of the information."

We went further to explain the *Stayanchi* holding when we stated that:

"The Ohio Supreme Court's ruling in *Stayanchi, supra,* can be interpreted to require two considerations. One consideration is a factual determination showing to what extent the information is known outside the business. Second, is to determine even when the information is known or not known outside, what precautions the possessor has taken to guard the secrecy of the information."

This rule of law is as true for a law firm as it is for a business corporation. A party claiming a trade secret must take affirmative steps to protect whatever information it deems secret before relief can be granted. Within the plain meaning of R.C. 1333.51(A)(3), a client list could be characterized as a trade secret as long as it satisfies the statutory provisions. In the instant case, however, Sonkin & Melena has not proved that its list was a trade secret. The record shows that the client list was prepared at the direction of Zaransky. He had the list at the office and also at his home to enable him to stay in contact with clients after normal working hours. Sonkin & Melena never requested that Zaransky return the list to the firm after he left the firm's employment. We assume that Zaransky had a one-on-one relationship with the clients on the list since the record shows that he handled their claims. Both Sonkin & Melena and Zaransky have a responsibility to inform the clients whose claims were handled by Zaransky that he is no longer in the firm's employ. We, therefore, do not consider Zaransky's attempt to inform the clients about his change of employment as being either unreasonable or a violation of a trade secret within the meaning of R.C. 1333.51(A)(3).

Since no attempt was made by Sonkin & Melena to demonstrate that the names were trade secret, either by forbidding Zaransky from using them since the firm knew that he had them or by stipulating in a contract of employment that the use of such names at the termination of employment constitutes a violation of trade secret laws, we hold that no violation of R.C. 1333.51(A)(3) occurred and Sonkin & Melena's argument fails.

Sonkin & Melena further argues that the trial court erred in failing to award punitive damages against Zaransky. "The purpose of punitive damages is to deter, set example and punish an unbecoming conduct of the defendant." *Foster v. RTA West Fed. Credit Union* (Aug. 29, 1991), Cuyahoga App. Nos. 58939, 58941, unreported, 1991 WL 174187. See, also, *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 543 N.E.2d 464. Since Zaransky's conduct was neither punishable nor unbecoming, the trial court properly ruled against a punitive damage award. Accordingly, Sonkin & Melena's third assignment of error is also overruled.

As to Zaransky, the trial court's judgment is affirmed in part, reversed in part and remanded, consistent with this opinion. Its judgment as to Sonkin & Melena's cross-appeal is affirmed *in toto.*

*Judgment accordingly.*

ANN MCMANAMON, P.J., and JAMES D. SWEENEY, J., concur.