JOURNAL ENTRY and OPINION
In this action that resulted in the jury's award of $175,000 to plaintiff-appellee Novomont Corporation, defendant-appellant The Lincoln Electric Company appeals from the trial court's denial at the close of evidence of its motion for a directed verdict.
Appellant argues appellee could not recover from appellant on claims of both quantum meruit and unjust enrichment; thus, the verdict forms provided to the jury were flawed. Appellant further argues appellee rendered services to appellant without expectation of compensation; therefore, judgment in appellee's favor was improper.
This court has reviewed the record and determines the trial court's order was appropriate. Consequently, the trial court's order is affirmed.
Appellant is a manufacturer of welding equipment and "consumables,"[1]
i.e., materials used for the welding process, such as wire and solder. It has been in business for many years, has thousands of employees, and has offices in many countries.
As part of its effort to develop its sales potential, appellant created a program called "Guaranteed Cost Reduction" ("GCR"). Appellant's sales team, engineers and "distributor partners" would approach a customer, outline a plan designed to promote efficiency in the welding process, implement the idea with the customer's approval, and determine if the plan saved the customer money. If the plan did not meet the financial "target" promised to the customer by appellant, appellant "would essentially pay the customer the difference between what was achieved and what the original target was."
Appellant's chief executive officer, Don Hastings, developed the GCR program; its manager of national accounts assumed responsibility for the program. In 1987, Larry Tyler became appellant's manager of national accounts. Although Tyler received promotions in 1992 and 1997, he remained involved in the GCR program. Similarly, although in 1997 Hastings retired from appellant and became its chairman emeritus, he continued his interest in the GCR program's progress.
Appellant had some success with the GCR program; its "peak year" was in 1995, with approximately "200" programs "in place." Subsequently, however, the numbers began precipitously to decline. By 1997, appellant had only fifty customers subscribing to the program.
The GCR program's decline so concerned Hastings that, at a civic function, he mentioned it to Howard Rosenberg. Rosenberg was the president of appellee, a company in the business of providing "manufacturing and operations and capital management consulting services." Appellee sought to "work with companies" in order to "identify areas to improve their profitability" and to "work with [business] professionals" in order to "implement" appellee's "ideas."
Hastings' conversation with Rosenberg led to Hastings' sponsorship of a meeting between Rosenberg, Rosenberg's partner Robert Maguda, and Tyler. The meeting took place in late August, 1997.
At Hastings' instigation, Tyler described to appellee's partners appellant's GCR program. Tyler then voiced his desire to see the program reach a better performance level so that it could be of better service to appellant. Finally, Tyler outlined the "constraints" he believed limited the program's usefulness to appellant. These constraints included, interalia, a customer problem-solving approach that took place at the plant level rather than at the corporate level, a focus solely on the welding process itself rather than on "upstream" factors that also might affect the total costs involved in the welding process, and an inability for appellant to receive any remuneration for the technical consulting services it was providing to the customer.
Following the meeting, Rosenberg sent a letter to Tyler in which he summarized the topics of discussion and set forth "options of how to proceed." Rosenberg strongly proposed the creation of a "project oriented organization" that provided appellant's customers an "alternative, high value added distribution channel" with "full service capability." Rosenberg suggested another meeting and concluded the letter as follows:
 Larry, I look forward to exploring these, and any other options you might have, with you. Novomont's role could be to provide program management, consulting, and implementation skills to assist Lincoln in bringing the GCR program to "the next level." In addition we might consider forming a joint venture with the appropriate strategic partners who have the necessary capabilities that Lincoln may not have.
(Emphasis added.)
A little over a month later, Rosenberg gave a "power point presentation[2] to Tyler and two other executives responsible for appellant's GCR program. The purpose of this presentation was to put forward Rosenberg's proposed re-organization of the GCR. Since the presentation was well received, Rosenberg prepared another for the following month.
By November 24, 1997, the date of the next presentation, Rosenberg had dubbed his proposal for the revamping of appellant's GCR program the "Value Enhancing Services Enterprise" ("VASE"). As Rosenberg envisioned it, appellant and appellee would form a joint venture that would be able to "put together a variety of services" for appellant's customers, thus improving appellant's customers' "profitability" and enabling appellant to charge for its professional expertise. The idea was to launch a project for which appellant would provide the resources and the welding expertise while appellee provided the management services to further appellant's customers' business efficiency.
Following the meeting, Tyler told Rosenberg his idea was "exactly what [appellant] needed." He told Rosenberg to prepare to "launch" the project in January, 1998.
Subsequently, however, Tyler met with Rosenberg informally in late December, 1997 to request appellee "to continue to refine" the project. Tyler indicated a desire to present the VASE "preliminarily" to a few of appellant's customers.
On January 16, 1998 Rosenberg became aware that Tyler and a few of appellant's other executives wished first to develop a "pilot program" for a select group of customers rather than directly to "launch" the joint venture. At a March, 1998 meeting, Rosenberg expressed some apprehension about appellant's commitment. He informed Tyler that appellee "ha[d] invested and continue[d] to invest significant amount[s] of time" in the project to improve the GCR program. Rosenberg indicated he would like appellant to "consider" some type of compensation for appellee.
Tyler reassured Rosenberg that the VASE concept was "critical" to appellant but that if appellee "was to charge consulting fees, it would appear [to appellant] that [appellee] wanted to be a consultant" rather than a "partner." Tyler suggested that appellee would reap greater benefits from the concept as appellant's partner. He requested Rosenberg to continue working on the project and to present his plans to appellant's recently-hired manager of "new business development," James Schilling.
In February and March, 1998 meetings, Rosenberg reviewed for appellant the organizational structure of the proposed new enterprise. On May 29, 1998 Rosenberg presented to Tyler and Schilling a pro forma financial analysis. Rosenberg, by this method, demonstrated VASE's funding sources, revenue stream, and specific service offerings.
Following this meeting, Tyler identified a customer that could be used for the initial "pilot project." Rosenberg understood that the success of the pilot project would "justify the full scale launching of the VASE and the formation of the joint venture." Tyler forwarded information to appellee about the customer, Manchester Tank, in order for Rosenberg to fully prepare to present a VASE application to its business. Tyler also worked with appellee to make the presentation "attractive." The presentation to Manchester Tank was scheduled for July 21, 1998.
However, in the meantime, Schilling was soliciting opinions about the VASE proposal from a few of appellant's managers. The consensus, which persuaded Schilling, was that appellant could "do it alone" and did not need appellee to participate with it in a joint venture.
The presentation of the VASE application to Manchester Tank proceeded as scheduled. Although it seemed to be well received, Manchester Tank's "CEO's" told Rosenberg they needed some time to "assess" the program's benefit to their business. Rosenberg indicated he would "check back with them in three weeks."
At the conclusion of the presentation, Rosenberg suggested to Tyler they initiate contacts regarding the VASE concept with other customers. Approximately two weeks later, however, without having received a reply from Manchester Tank to the VASE proposal, Rosenberg was called to a meeting at appellant. There he was informed by Tyler, Schilling and Paul Fantelli, one of appellant's vice presidents, that appellant "was no longer interested in VASE." Appellant's officers told Rosenberg appellant could not provide the resources for the project.
Rosenberg sought out Tyler upon the meeting's termination. Tyler suggested that due to appellant's reputation for poor treatment of small contractors, Rosenberg should present a bill for appellee's services.
Rosenberg did so in September, 1998. He "recreated" an estimate of the time he had spent in developing the VASE project, multiplied it by his customary rate of pay, and then divided it by half for appellee's intended "investment" in the project in order to come to a final invoice figure of $175,000. Appellant, however, refused to pay appellee.
On June 1, 1999 appellee filed the instant action against appellant seeking recovery on claims of breach of contract, quantum meruit, unjust enrichment, and negligent misrepresentation. After a lengthy discovery process, the matter proceeded to a jury trial.
During its case-in-chief, appellee called as witnesses Tyler, Schilling and a few other officers of appellant, then called upon Rosenberg to testify. Appellee also introduced several documents into evidence.
Although appellant's subsequent motion for a directed verdict was granted with respect to appellee's claim of breach of contract, it was denied with respect to appellee's remaining claims. Appellant then presented its own two witnesses. Thereafter, the trial court denied appellant's renewed motion for directed verdict at the close of evidence.
Ultimately, the jury returned a verdict for appellee on its claims ofquantum meruit and unjust enrichment, awarding appellee a total amount of $175,000 on the two claims. Since the jury could not come to a verdict on the remaining claim, appellee voluntarily dismissed it, thereby lending finality to the proceedings below.
On appeal, appellant presents one assignment of error for this court's review as follows:
 THE TRIAL COURT ERRED WHEN IT OVERRULED THE DEFENDANT-APPELLANT'S MOTION FOR DIRECTED VERDICT AT THE CLOSE OF EVIDENCE.
Appellant presents two distinct arguments that it asserts justify the foregoing statement. Appellant first argues that appellee's claims ofquantum meruit and unjust enrichment were not separate causes of action but rather "one equitable claim"; therefore, the trial court acted improperly in otherwise instructing the jury and in submitting to the jury a verdict form for each.
This court finds it unnecessary to address this argument. Appellant raised no objections to either the trial court's instructions to the jury in this regard or to the verdict forms themselves; hence, it has waived this argument for purposes of appeal. State v. Williams (1977),51 Ohio St.2d 112; Stores Realty Co. v. Cleveland (1975), 41 Ohio St.2d 41,43.
Appellant next argues a directed verdict on appellee's equitable claims was appropriate since appellee rendered services without expectation of a present benefit. Appellant contends appellee engaged in only "preliminary negotiations" for an enforceable contract; therefore, appellee must bear any resulting costs as those of simply doing business. This court disagrees.
Civ.R. 50(A)(4) provides:
 RULE 50. Motion for a directed verdict and for judgment notwithstanding the verdict.
 (A) Motion for directed verdict.
* * *
 (4) When granted on the evidence. When a motion for a directed verdict has been properly made, the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse
to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.
(Emphasis added.)
In Eldridge v. Firestone Tire Rubber Co. (1985), 24 Ohio App.3d 94, the application of Civ.R. 50(A)(4) was explained as follows:
 The determination to be made by a trial court when a motion for directed verdict has been made is not whether one version of the facts presented is more persuasive than another; rather, it is a determination that only one result could be reached under the theories of law presented in the complaint. When a motion for directed verdict is entered, it is the legal sufficiency of the evidence to take the case to the jury that is being tested. The trial court may not weigh the evidence or try the credibility of witnesses, but must give to the party opposing the motion the benefit of all reasonable inferences from the evidence. The "reasonable minds" test of Civ.R. 50(A)(4) requires the court only to determine whether there is any evidence of substantial probative value in support of the non-moving party's claim. A motion for a directed verdict raises a question of law because it examines the materiality of the evidence
rather than the conclusions to be drawn from the evidence. [Citation omitted.]
(Emphasis added.)
Thus, as the Ohio Supreme Court more succinctly stated:
 Simply because resolution of a question of law involves consideration of the evidence does not mean that the question of law is converted into a question of fact or that a factual issue is raised.
Ruta v. Breckenridge-Remy Co. (1982), 69 Ohio St. 66 at 68.
Appellee in this case presented claims against appellant of both unjust enrichment and quantum meruit. These claims for relief carefully were explained by the court in Caras v. Green Green (June 28, 1996), Montgomery App. Nos. 14943, 15089, unreported, as follows:
 A quasi-contract is a contract implied in law. Hummel v. Hummel (1938), 133 Ohio St. 520, 525, 14 N.E.2d 923. * * *
 * * * In contracts implied in law there is no meeting of the minds, but civil liability arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain and for which he may be made to respond to another in an action in the nature of assumpsit. Contracts implied in law are not true contracts; the relation springing therefrom is not in a strict sense contractual but quasi-contractual or constructively contractual.
 [Keener on Quasi-Contracts (1893), 3]; see also Rice v. Wheeling Dollar Savings Trust Co. (1951), 155 Ohio St. 391, 99 N.E.2d 301; 1 Willison on Contracts (4th Ed. 1990), Sections 1:5 and 1:6.
 Quasi contracts developed from the desire of the law to bring about justice without any reference to the intention of the parties, and sometimes contrary to their intention. The principle upon which they are founded is prevention of unjust enrichment, and the remedy provided is by an action as though it were upon a contract. Williams v. Goodyear Aircraft Corp. (1948), 84 Ohio App. 113, 117, 85 N.E.2d 601; see also Hummel v. Hummel, 133 Ohio St., at 527-528; Rice v. Wheeling Dollar Savings Trust Co., supra, at 396.
 A quasi-contract is a legal fiction that does not rest upon the intention of the parties, but rather on equitable principles in order to provide a remedy. The two remedies most often associated with quasi-contracts are restitution and quantum meruit. Each of these remedies presupposes some type of unjust enrichment of the opposing party. Paugh Farmer, Inc. v. Menorah Home for Jewish Aged (1984), 15 Ohio St.3d 44, 46, 472 N.E.2d 704 (emphasis in the original).
 Quantum meruit means "as much as deserved." Sonkin Melena Co., L.P.A. v. Zaransky (1992), 83 Ohio App.3d 169, 175, 614 N.E.2d 807. "Quantum meruit is a doctrine derived from the natural law of equity, the basic concept of which is that no one should be un-justly enriched who benefits from the services of another. In order to prevent such an unjust enrichment, the law implied a promise to pay a reasonable amount for the services rendered * * *, in the absence of a specific contract. Id.
 The elements of an action in quasi-contract on a claim of unjust enrichment are a benefit conferred, knowledge of the benefit by the receiving party, and a retention of the benefit under circumstances which would make it unjust to do so without payment. Advanced Marketing Services, Inc. v. Dayton Data Processing, Inc. (March 6, 1992), 1992 Ohio App. LEXIS 994, Montgomery App. No. 12607, unreported, at 4; see also Hambleton v. R.G. Barry Corp. (1984), 12 Ohio St.3d 179, 183, 465 N.E.2d 1298.
 From the foregoing, it is apparent that the concepts of quasi-contract, unjust enrichment and quantum meruit are interrelated. A claim for unjust enrichment arises when one person has unfairly benefited from the services of another. In that event, courts have adopted a legal fiction, quasi-contract, to provide a remedy allowing the aggrieved party to seek recovery for as much as he deserves. That remedy is a claim for quantum meruit relief.
(Emphasis in original; underscoring added.) See, also, Kraft Constr. Co.v. Bd. of Commrs. (1998), 128 Ohio App.3d 33, 48.
The evidence in this case, when viewed most strongly in appellee's favor, demonstrated the following: Appellee was in the business of designing "operational improvement programs" for businesses. Both Hastings and Tyler sought appellee's expertise in improving appellant's method of operating its GCR program. Appellee provided the expertise by formulating the VASE project, which subsequently was used by appellant in an effort to enhance its relationship with Manchester Tank. Thus, appellee rendered appellant a service, appellant had knowledge of and made use of that service, and appellee received nothing of value in return from appellant. Donovan v. Omega World Travel, Inc. (Oct. 5, 1995), Cuyahoga App. No. 68251, unreported.
Under these circumstances, the trial court properly denied appellant's motion for a directed verdict on appellee's claims of unjust enrichment and quantum meruit. Id.; cf. Shaw v. Pollock Co. (1992),82 Ohio App.3d 656. Accordingly, appellant's assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES D. SWEENEY, J. and JAMES J. SWEENEY, J. CONCUR.
[1] Quotes indicate testimony given by a witness at trial.
[2] Tyler described this as a "computerized slide program.