[Cite as *Woods v. Porter*, 2011-Ohio-6407.]


STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT


| | | |
|---|---|---|
| SHAWN WOODS, | ) | |
| | ) | CASE NO.   11 JE 16 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | O P I N I O N |
| | ) | |
| ED PORTER, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |


CHARACTER OF PROCEEDINGS:        Civil Appeal from County Court #1, Case Case No. 09CVI1.


JUDGMENT:        Affirmed.


APPEARANCES:
For Plaintiff-Appellee:        Attorney Gary Stern
108 South Fourth Street
Steubenville, Ohio  43952


For Defendant-Appellant:        Attorney John Mascio
325 North Fourth Street, Lower Level
Steubenville, Ohio  43952


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated:  December 5, 2011

VUKOVICH, J.

{¶ 1} Defendant-appellant Ed Porter appeals the decision of the Jefferson County Court, which ruled in favor of plaintiff-appellee Shawn Woods on his small claims complaint. Appellant contends that the trial court's decision to award appellee damages for partial performance of an oral service contract is contrary to the manifest weight of the evidence. He states that appellee's performance was unsatisfactory and thus he was not required to pay him for the services rendered and material used. For the following reasons, the judgment of the trial court is affirmed.

<u>STATEMENT OF THE CASE</u>

{¶ 2} In hopes of constructing an underground bomb shelter/root cellar, Mr. Porter purchased a ten-foot in diameter, twenty-foot long pipe, large sheets of steel, a steel door from a shipping container, and a three-foot in diameter culvert pipe to be used as an escape hatch. (Tr. 16, 72). He contacted Mr. Woods, who advertised that he provided welding services. Porter hired Woods to enclose the ends of the pipe with the metal sheets, to bolt the door at one end of the pipe, to cut a hole in the top of the pipe near the other end for an escape hatch where the culvert pipe was to be attached at approximately a forty-five degree angle, and to attach inlets for future connection to utilities. (Tr. 16-17).

{¶ 3} Woods advised that he charged $50 per hour plus nonexpendable materials. Woods stated that he could begin on December 8, 2009 but warned that he was having knee surgery on December 16. Porter was in a rush to begin the project so Woods began work and had employees assist after a three-day recovery from his surgery. (Tr. 22-23). There were some weather delays for snow and rain. (Tr. 23).

{¶ 4} While installing the door, Woods used temporary tack welds to hold it in place during positioning. Woods then noticed that certain places needed to be welded to properly hold the door in place in addition to requested bolts. (Tr. 24-25). That night, Porter called Woods as he was upset that Woods' employees had the escape hatch in the wrong position. Woods told him that he realized this fact and explained that it was only affixed by temporary tack welds used to help align and evaluate positions. (Tr. 25). Porter also complained that the workers took too long to align the

door. Due to these complaints, Woods stated that he could either take two hours off the bill or he could pull off the job with Porter paying what he owed so far. (Tr. 27). Porter accepted the bill reduction option.

{¶ 5} The next day, Woods installed the escape culvert at a forty-five degree angle as requested and cut the corresponding hole in the top of the pipe. When Porter viewed it, he opined that the angle was not steep enough to reach above ground once buried three feet down. (Tr. 29, 40). Woods responded that the culvert Porter provided was too short; he recommended getting another section of pipe to extend the escape tunnel. (Tr. 29).

{¶ 6} Before he left on December 22 at 9:30 p.m., Woods promised he would return to take care of anything they missed in the dark and snow. (Tr. 29-30). He explained that he needed to pay his employees and presented a bill for 45.5 hours of labor at $50 per hour and $271 in materials for a total of $2,546. (Tr. 22, 30). Appellant responded that "the lady who writes the checks" was not home and may not be home the next day either.

{¶ 7} On December 24, Porter called Woods and told him the project was a mess. Woods responded that he would take care of any issues, as he had previously advised. With regards to the lack of payment, Porter stated that they would have to take it to court. (Tr. 37). They then got into an argument, which resulted in Woods stating that he was going to remove the welding rods as they had not been paid for. (Tr. 35). Thereafter, Porter moved the pipe across the street in some unknown manner. In viewing the pipe on a court view during trial, Woods noticed that one side had been dented from the mode of transportation, which caused the unit to lose its sturdiness and the door to no longer shut tightly. (Tr. 38).

{¶ 8} Woods filed suit against appellee in small claims court for the amount of the unpaid invoice, $2,546. Porter answered that the work was improper and unprofessional. He also filed a counterclaim seeking the cost to hire another welder to complete the project. The case was tried to the court. Woods testified to the above facts, but Porter did not testify.

{¶ 9} On cross-examination, Woods acknowledged that he was instructed to bolt the door on, but explained that part of the door does not have enough frame to

bolt to and that welding makes it sturdier. (Tr. 51). He conceded that a utility inlet structure needed steel welded next to it in order to enclose a hole. However, he explained that it was dark and snowing when they finished, the hole was near the bottom of the pipe in inches of snow, and he had offered to come back to finish anything they may have missed due to the conditions. (Tr. 54). When asked about pinholes in some of the welds, Woods stated that when you weld galvanized steel, it causes pinholes and other imperfections in the weld. He stated that after they began the project, he informed appellant that if he wanted it to be waterproof, the pipe would have to be tarred for waterproofing (by someone else) or he would have to spend $15,000 on X-ray quality welding (which is a triple pass on every weld). (Tr. 19-20, 55). He also testified that Porter had not informed him before beginning that he was to make the project waterproof. (Tr. 66-67).

{¶ 10} Woods then presented the testimony of a welder whom Porter called in February of 2010. This welder noted that Porter told him that the angle was wrong on the escape hatch, without mentioning what angle Porter specified. (Tr. 75). He responded to Porter's complaint about the escape culvert by saying that an exact angle is nearly impossible on corrugated pipe and pointed out that if you cut a length of pipe in order to angle it, it will get shorter. (Tr. 72). He noted that besides the corrugated shape making for hard work, the galvanized character of the steel is also hard to work with. (Tr. 74). When asked about the quality of Woods' work on this project, he opined, "With the material to work with I believe that was about as good as it could get." (Tr. 78). He did not provide Porter with a quote because he did not want to work on the project.

{¶ 11} Woods presented the testimony of another welder who had been contacted by Porter in September of 2010 about finishing the welding job. (Tr. 92). He testified that welding corrugated steel is "a tough animal" and does not provide an easy fit so that a forty-five degree angle would have been "tough for anybody to do." (Tr. 93, 95). He estimated that the entire job should have cost $6,000 to $10,000. (Tr. 106-107). He opined that the welding was done relatively well considering the material. (Tr. 94).

{¶ 12} Porter then called two welders in his defense. One welder stated that Porter told him that the utility pipe ports were not in the requested location, the escape hatch was not at the proper angle, and the door should not have been welded. (Tr. 116). This welder opined that any welds with holes should be rewelded. (Tr. 119). He had provided an estimate that completing the project to Porter's specifications would cost $7,500 either from the beginning or from this point. (Tr. 120). He then noted that labor costs have gone up 10% in the past year. (Tr. 121). He estimated that the amount of welding already performed would have taken at least 40 hours. (Tr. 125).

{¶ 13} The testimony of the other welder for the defense was not transcribed. According to the court's findings, this witness gave Porter an estimate that it would take $8,000 to complete the project but he stated that he would not do the work in the field. In placing a value on the existing welding, he opined that it was worth $4,000.

{¶ 14} On April 26, 2011, the court issued a judgment in favor of Woods for $2,546. The court found that Woods partially performed the contract. The court noted that even Porter's witnesses admitted that the welding work had a value and that he had performed at least $4,000 in welding services. The court found that the work was performed as well as could be expected given the nature of the material and the weather conditions. The court stated that the work was not done in an unworkmanlike manner but rather was done reasonably well under the circumstances. The court essentially found that it was Porter's fault that Woods could not complete the project. The court concluded that failure to complete the contract is excused where performance is prevented by the other party and that once Porter repudiated the contract, Woods was entitled to reasonable compensation for his partial performance. The court found that the amount requested by Woods was reasonable for the work done. Porter filed timely notice of appeal.

ASSIGNMENT OF ERROR

{¶ 15} Porter's sole assignment of error provides:

{¶ 16} "THE TRIAL COURT ERRED BY RENDERING A VERDICT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, THEREBY COMMITTING AN ABUSE OF DISCRETION."

{¶ 17} The doctrine of quantum meruit is an equitable remedy where the court uses its discretion to enforce obligations imposed by law in order to prevent an injustice when one party retains a benefit from another's labors. *Pawlus v. Bartrug* (1996), 109 Ohio App.3d 796, 800 (9th Dist.). The plaintiff cannot recover more than the actual value of the services rendered for defendant, including the value of materials and fair profit, and the plaintiff cannot recover more than the amount the defendant was enriched by his rendering of services. *Sonkin & Melena Co., L.P.A. v. Zaransky* (1992), 83 Ohio App.3d 169, 175 (8th Dist.).

{¶ 18} Porter agrees that partial performance of contracted for services gives rise to a cause of action to recover the value of the work performed where one party prevents the other party from performing. See id, citing *Fox & Assoc. Co. v. Purdon* (1989), 44 Ohio St.3d 69, 72. However, Porter notes that the work performed must be done in a workmanlike manner. He then argues that the work performed by Woods was substandard and thus Woods was not entitled to compensation for his partial performance. Porter also states that he contracted for a job that Woods "said he would do for $2,546" and because the job will now have to be performed by someone else for over $7,500, Woods should have to pay him for the amount he will have to expend to have the job completed. (Apt. Br. at 13).

{¶ 19} Initially, it should be pointed out that Woods did not hold himself out as having skills at building a bomb shelter or a root cellar. He merely took on a welding job for someone who had materials that he wished to have welded together. Next, it must be recognized that, contrary to Porter's statement, Woods did not contract to perform the job for $2,546. This was how much he had expended so far in labor and materials at the orally agreed upon rate. Moreover, testimony established that the welds performed so far were worth far more than Woods was charging for his performance. Testimony established that the welding performed by Woods was reasonable and as good as could be given the materials and weather conditions.

{¶ 20} The difference between a simple weld on galvanized steel and an X-ray (or triple) weld was explained. It was explained how simple welds in galvanized steel will naturally have pinholes. Woods testified that Porter did not advise him prior to beginning that he wanted a waterproof unit. (Tr. 66-67). After the project started,

Porter declined Woods offer of a triple weld due to the expense but rather seemed to prefer to have the unit tarred or otherwise waterproofed after the simple welding was complete. (Tr. 19). He asked if Woods would be interested in doing the tarring, but Woods declined. (Tr. 20). Thus, the fact that the welds had pinholes does not per se lead to the conclusion that the welding was performed in an unworkmanlike manner.

{¶ 21} Moreover, the estimates dealt with what others would have charged from start to finish, not to complete the project as is. Any suggestion by a defense witness that the cost would be the same or more to finish it than it would to start from scratch seemed to encompass rewelding all the welds with pinholes. However, as aforementioned, a reasonable fact-finder could determine that such perfectly-sealed triple pass welds were not part of the contract.

{¶ 22} As for the placement of utility outlets, one need not believe that these were misplaced. Woods testified, Porter did not. Some welders that viewed the project months later testified that Porter told them that he wanted the outlets in a different place, but this does not mean that Porter had clearly advised Woods of the same. Woods suggested that Porter's expectations were approximations.

{¶ 23} As for the hole around an outlet, Woods left in the snow and in the dark after twelve straight hours of work with every intent to return, but Porter would not permit him to return. (Tr. 29, 54). Testimony established that this hole was inevitable in cutting corrugated pipe for attachment of the outlets and that it was a simple job to take a piece of steel and weld it over the hole. (Tr. 53).

{¶ 24} Regarding the escape hatch, Woods testified that it was originally tack welded to the pipe prior to making any cut to determine if its position was acceptable. Both Woods and Porter agreed that it was not in the proper spot. (Tr. 25-26, 44). It was repositioned and welded on the next day. Woods testified that Porter then opined that the angle was not steep enough to put the pipe above ground level once the unit was buried three feet underground. *Contrary to Porter's contention, Woods did not testify that the angle varied from the approximate angle originally requested by Porter; that is, Woods testified that he installed the escape culvert at approximately a forty-five degree angle as requested.* (Tr. 29, 40). Woods explained that the culvert Porter provided was too short, and Woods recommended getting another section of pipe to

extend the tunnel. (Tr. 29). However, Porter prohibited him from attempting this extension. Other welders (who would not have even undertaken the difficult and dangerous job) confirmed that a perfect angle could not be expected when using corrugated pipe.

{¶ 25} As for the shipping container door installed at the end of the large pipe, Porter instructed that he wanted it bolted on. *Woods did bolt the door* on but also placed a weld along the top; Woods explained that the door would not properly stay in place without this weld, that the weld would make it sturdier, and that the door did not have enough frame so there was no flange to bolt the door to on the one side. (Tr. 24, 51). Other welds on the door, with which Porter apparently had issues, were mere temporary tack welds commonly used to position an object prior to permanently affixing it. (Tr. 24-25). It was established that these tack welds could easily be removed. No evidence establishes how the welding along the top of the door constitutes a lack of partial performance, how it constitutes unworkmanlike conduct, or how it will affect Porter's end result. Woods provided a perfectly reasonable explanation for why he placed the weld along the top, and Porter does not provide a reason why this extra fastening affected the project in a negative way. In any event, even if the weld should be removed, this does not result in Woods receiving no payment for the work and materials expended on this job.

{¶ 26} Rather, the court could reasonably find that Woods rendered partial performance and that the bill submitted for this partial performance was reasonable in light of the testimony on what the welding job was worth and testimony that the welds were done well for the material and conditions.

{¶ 27} Appellate review of the manifest weight of the evidence in a civil case is much more deferential to the trial court than in a criminal case. *State v. Wilson*, 113 Ohio St.3d 382, 2007–Ohio–2202, ¶26. The civil manifest weight of the evidence standard provides that judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. Id. at ¶24, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279. The reviewing court is obliged to presume that the findings of the trier of fact, and the rational inferences to be drawn therefrom,

are correct. Id., citing *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80-81. A difference of opinion on credibility of witnesses or weight to be given to testimony is not a ground for reversal. Id.

{¶ 28} The court viewed Woods testimony and found him to be a credible witness. The court heard testimony from other welders who believed that the welding job was performed in a reasonable manner given the material. It was Porter who supplied the material and who rushed the job. According to the court's findings, it was Porter who unreasonably prohibited Woods from returning to complete any remaining items. The judgment is not contrary to the manifest weight of the evidence, and the court did not abuse its discretion in arriving at damages.

{¶ 29} For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Donofrio, J., concurs.
DeGenaro, J. concurs.